EL PUEBLO DE PUERTO RICO, apelado, *v.* FERNANDO RUIZ BOSCH, acusado y apelante.

*Número:* CR-86-97          *Resuelto:* 25 de enero de 1991

*Joaquín Monserrate Matienzo, Abelardo Ruiz-Suria, Fernando Ruiz-Suria* y *Arturo J. García Solá,* abogados del apelante; *Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General, Ricardo E. Alegría Pons, Procurador General Auxiliar,* e *Irma Alicia Rodríguez Avilés, Fiscal Auxiliar Superior,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El día 30 de marzo de 1982, agentes de la Policía de Puerto Rico ocuparon, en jurisdicción del pueblo de Moca, setecientas ochenta y siete (787) libras de la sustancia controlada conocida como marihuana. En relación con ello, el Estado radicó acusaciones contra varias personas —entre ellas, el aquí apelante Fernando Ruiz Bosch— por infracción al Art. 401(a)(1) de la Ley de Sustancias Controladas de Puerto Rico,[1] 24 L.P.R.A. sec. 2401(a)(1).

Convicto que fuera, en proceso celebrado por tribunal de derecho, ante el Tribunal Superior de Puerto Rico, Sala de Aguadilla, Fernando Ruiz Bosch apeló ante este Tribunal de la sentencia de doce (12) años de presidio que le fuera impuesta. En el recurso de apelación que radicara ante este Tribunal el día 12 de diciembre de 1986 le imputó al foro de instancia la supuesta comisión de seis (6) errores, a saber:

A. No se probó posesión de la marihuana por parte del apelante.

B. Un análisis de toda la prueba demuestra que no se probaron más allá de una duda razonable todos los elementos del delito por el cual se condenó al apelante.

---

[1] Ley Núm. 4 de 23 de junio de 1971, según enmendada.

C. El arresto del apelante fue ilegal y por ende era inadmisible la evidencia obtenida como frutos del mismo.

D. No se cumplió con los mandatos del caso *Miranda vs. Arizona*, 384 U.S. 436; 16 L.Ed.2d 694 (1966), antes de interrogar al apelante y éste hacer ciertas alegadas admisiones incriminatorias conllevando que las mismas sean inadmisibles en evidencia.

E. No se estableció en forma razonable la cadena de custodia de los forros y de los pedales del avión que permitiera la introducción de prueba pericial basada en un examen de los mismos.

F. Aún si se sostuviera la convicción, la pena impuesta debe modificarse ya que:

a. [S]e impuso una pena equivocada[.]

b. se incurrió en abuso de discreción al rechazar los atenuantes.

c. La pena impuesta constituye un castigo cruel, exagerado e injustificado. Alegato del acusado-apelante, pág. 5.

Los referidos señalamientos de error hacen necesaria una *exposición detallada* de la prueba que desfiló ante el tribunal de instancia, según ésta surge de la *transcripción* que ordenáramos, a petición del apelante, mediante Resolución de fecha 30 de diciembre de 1986.

I

Con motivo de una confidencia anónima que se recibiera por la Policía de Puerto Rico —a los efectos de que los días martes o jueves un avión dejaba caer en horas de la noche, en el Barrio Palma de Aguadilla, "paquetes" conteniendo sustancias controladas, los cuales eran recogidos por personas que esperaban en el sitio en vehículos de motor— el agente Corpus Hernández, adscrito a la División de Drogas y Narcóticos de la Policía de Puerto Rico, se dirigió a dicho lugar el día 30 de marzo de 1982. Como a eso de las 9:30 P.M. el agente Hernández escuchó —por radioteléfono— que se requería la presencia de un "agente de drogas" en el *Barrio Aceituna* de Moca en relación con un vehículo de motor chocado que contenía drogas en su interior.

Al llegar al sitio, el agente Hernández pudo observar que se trataba de un vehículo Chevrolet Montecarlo, color marrón, en el

interior del cual había un sinnúmero de paquetes plásticos conteniendo gran cantidad de marihuana. Dicho vehículo había impactado por la parte trasera un vehículo de motor perteneciente al Sr. Tomás Pagán Marrero, huyendo del lugar el conductor del Chevrolet Montecarlo. Encontrándose en dicho lugar, el agente Hernández fue informado que en el mismo *Barrio Aceituna* de Moca, sector conocido como "Pista de los Labadí", había "aterrizado" algún tiempo antes una avioneta, en el interior de la cual igualmente se había encontrado marihuana.[2]

Al personarse en la "Pista de los Labadí", Hernández efectivamente pudo comprobar que en el interior de la avioneta —con el número de identificación N309MJ— había dos (2) paquetes, similares a los encontrados en el vehículo Chevrolet Montecarlo, que contenían marihuana. La avioneta en cuestión estaba "metida en el cañaveral". El agente Hernández, en unión a otro compañero, se internó en dicho cañaveral en búsqueda de los ocupantes de la avioneta, atravesando el mismo. Ello tuvo la consecuencia de que tanto sus zapatos, como sus pantalones, se "llenaran de fango y cadillos".

Habiendo atravesado el cañaveral, al llegar a la Carretera Núm. 2, el agente Hernández se topó con una patrulla de la División de Tránsito de la Policía de Puerto Rico, la cual era conducida por el policía Ángel Acevedo. El agente Hernández inquirió de éste sobre la posible presencia en el sector de personas "extrañas" al mismo. El policía Acevedo le indicó que efectivamente había observado, cerca de allí, a dos (2) individuos que no eran de la demarcación. Los tres (3) agentes del orden público se dirigieron al lugar donde los dos (2) sujetos habían sido observados por el policía Acevedo, localizando a los mismos. Estos resultaron ser el aquí apelante Ruiz Bosch y un individuo de

---

[2] La primera persona en llegar al lugar, luego de que la avioneta "aterrizara", fue un agente de la Policía —el testigo de cargo Nelson Pérez Hernández— *que vive cerca de la "Pista de los Labadí" y que escuchó el ruido que hizo el avión al accidentarse.*

Cuando el agente Pérez Hernández llegó a dicho lugar *no* había persona alguna en el mismo. *Pérez Hernández sí pudo observar, cerca de la avioneta, huellas de zapatos y de las ruedas de un vehículo de motor.*

nombre José L. Rosario Ayala, quienes se encontraban conversando el uno con el otro.

El agente Hernández pudo observar que, al igual que él, ambos sujetos tenían los zapatos y pantalones "llenos de fango y cadillos". Luego de indentificarse, y de inquirir sobre los nombres de los dos (2) individuos, Hernández le preguntó "de dónde eran". Al éstos contestar que de Mayagüez, les hizo varias preguntas sobre lugares conocidos de dicha ciudad y respecto al nombre del alcalde de la misma. Dichas preguntas no fueron contestadas correctamente por los dos (2) sujetos. Por último, Hernández les preguntó sobre qué "hacían ellos por allí". Éstos contestaron que se encontraban "bebiendo", dato que Hernández inmediatamente puso en duda en vista de que los individuos no "olían" a licor ni parecían estar embriagados.

El agente Hernández entendió que, a la luz de las circunstancias antes señaladas, él podía arrestar a los dos (2) individuos en controversia por infracción a la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2101 *et seq.* Así procedió a hacerlo, a eso de las 12:30 A.M. del día 31 de marzo de 1982. Luego de hacerle las "advertencias de ley" correspondientes procedió, en "protección" de su persona, a registrar a éstos y sus pertenencias. En una "cartera de mano" perteneciente a Rosario Ayala, el agente Hernández ocupó la licencia del vehículo de motor correspondiente al antes mencionado Chevrolet Montecarlo y las llaves del mismo, según pudo comprobar más tarde. Con posterioridad a que Ruiz Bosch y Rosario Ayala fueran llevados a la División de Drogas de la Policía en Aguadilla, este último fue identificado por el Sr. Tomás Pagán Marrero como el conductor del Chevrolet Montecarlo que se había dado a la fuga luego de impactar su vehículo de motor en el Barrio Aceituna de Moca, *cerca de la "Pista de los Labadí".*

Varias horas más tarde, estando todavía bajo custodia policíaca, el apelante Ruiz Bosch supuestamante le admitió al Fiscal del Distrito de Aguadilla —luego de que éste alegadamente le hiciera las "advertencias de ley"— que él era el piloto del avión accidentado en el Barrio Aceituna de Moca. Procede que se

señale, en adición, que los agentes del orden público tomaron muestras del fango incrustado en los zapatos del apelante Ruiz Bosch. Un examen del mismo demostró que éste podría proceder del área en que "aterrizó" el avión en controversia. En adición, un examen del fango adherido a la suela de los zapatos del apelante Fernando Ruiz Bosch reveló unas "esferas" también presentes en los forros de los pedales correspondientes al asiento del piloto del avión accidentado.

Tenemos, por último, que según una certificación de la Agencia Federal de Aviación en la noche del 30 de marzo de 1982, al comunicarse como a eso de las 9:51 P.M. el mencionado avión con el Centro de Control del área de Puerto Rico, el piloto de dicho avión reportó su nombre como "F. Ruiz".

## II

Dados los señalamientos de error del apelante Ruiz Bosch, y con el objetivo de una mejor comprensión de la decisión que en el presente caso emitimos, consideramos conveniente "dividir" en tres (3) etapas o categorías la prueba que durante el proceso celebrado presentara el Ministerio Público.

La primera de ellas consiste de la evidencia específicamente en poder, o del conocimiento, del agente Corpus Hernández *antes* de proceder éste al arresto del apelante Ruiz Bosch y del coacusado Rosario Ayala. La prueba con que contaba el agente Hernández en ese momento es sumamente importante por cuanto de la determinación que se haga sobre la suficiencia en derecho de dicha prueba para llevar a cabo el arresto efectuado depende no sólo la validez del mismo sino que de la referida determinación depende de manera principal, y más importante aún, la admisibilidad de parte de la evidencia que como resultado del arresto efectuado obtuvo el Estado. Ambas situaciones son objeto del tercer señalamiento de error por parte del apelante.

Como es sabido, la Regla 11 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, autoriza, en su inciso (c), a un funcionario del

orden público a efectuar un arresto sin la orden judicial correspondiente "[c]uando tuviere *motivos fundados para creer* que la persona que va a ser arrestada ha cometido *un delito grave (felony)*, independientemente de que dicho delito se hubiere cometido o no en realidad". (Énfasis suplido.)

Este Tribunal ha resuelto que la frase "motivos fundados" es sinónima de la de "causa probable" que contiene el Art. II, Sec. 10 de nuestra Constitución, L.P.R.A., Tomo 1. *Pueblo v. Díaz Díaz*, 106 D.P.R. 348 (1977). No debe perderse de vista que la "causa probable" se determina a base de *criterios de probabilidad y razonabilidad*, y que es doctrina firmemente establecida en nuestra jurisdicción que esa determinación tiene que basarse en *hechos* y no en meras sospechas. *Pueblo v. Rey Marrero*, 109 D.P.R. 739 (1980). Reiteradamente hemos resuelto que un agente del orden público tiene "motivos fundados" para arrestar a un ciudadano al entrar en posesión de aquella información o conocimiento que lleva a una persona *ordinaria y prudente* a creer que la persona a ser arrestada ha cometido un delito público, razón por la cual se hace necesaria la evaluación de las circunstancias específicas de cada caso en particular. *Pueblo v. Alcalá Fernández*, 109 D.P.R. 326 (1980); *Pueblo v. Lafontaine Álvarez*, 98 D.P.R. 75 (1969); *Pueblo v. Cabrera Cepeda*, 92 D.P.R. 70 (1965).

*¿Tenía el agente Corpus Hernández "motivos fundados" para arrestar en la noche del 30 al 31 de marzo de 1982 al aquí apelante Ruiz Bosch y al coacusado Rosario Ayala?* La contestación a la referida interrogante nos obliga, conforme la doctrina antes expuesta, a examinar *las circunstancias específicas de la situación ante nuestra consideración* con el propósito de determinar si una *persona ordinaria y prudente*, conforme *criterios de probabilidad y razonabilidad*, hubiera actuado al igual que lo hizo el referido agente del orden público.

La prueba desfilada demostró que, con anterioridad al momento en que el agente Hernández efectuó el arresto, éste contaba con una confidencia anónima a los efectos de que en dicho sector un avión regularmente dejaba caer paquetes conteniendo

sustancias controladas, las cuales eran recogidas por unas personas en vehículos de motor. En específico, dicho funcionario pudo observar esa noche en el Barrio Aceituna de Moca un vehículo de motor con un gran cargamento de marihuana, el conductor del cual, según le fuera informado, se internó en un cañaveral que colindaba con la "Pista de los Labadí" luego de verse envuelto en un accidente de automóviles. Pudo comprobar, en adición, que el referido cargamento de marihuana procedía de una avioneta que se había accidentado, algún tiempo antes de la ocurrencia del antes mencionado accidente de automóviles, al aterrizar en la referida "Pista de los Labadí", la cual avioneta se encontraba "internada" en el cañaveral. Realiza, entonces, el agente Hernández gestiones tendentes a localizar las personas relacionadas con el referido incidente, gestiones que causan que sus zapatos y ropas se "llenen de fango y cadillos", consecuencia directa de haberse él internado en el cañaveral en busca de dichas personas. Dicho agente del orden público localiza, cerca del sector donde se encuentra el avión y el automóvil con la marihuana, a dos (2) personas que no sólo no son residentes de dicho vecindario rural sino que resultan ser desconocidos para los agentes del orden público que trabajan regularmente en el mismo. El agente Hernández, inmediatamente que se acerca a dichos sujetos, observa que los zapatos y pantalones de los mismos se encuentran en las mismas condiciones que los de él, esto es, "llenos de fango y cadillos", tal como si éstos hubieran estado internados en el cañaveral cercano al sector donde estaban el avión y el automóvil.

En el *ejercicio razonable* del derecho, y la obligación, que tiene todo agente del orden público en nuestra jurisdicción de investigar toda querella sobre posible actividad delictiva, *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 144 (1985), el agente Hernández les hizo una serie de preguntas a dichos individuos. Al inquirir sobre el lugar de donde provenían, éstos no pudieron contestar satisfactoriamente preguntas que se le hicieran a esos efectos, las contestaciones a las cuales resultaban de fácil y obligatorio conocimiento para personas residentes de la ciudad de la cual ellos

originalmente alegaron provenir. Tenemos, finalmente en cuanto a este punto en particular, que la afirmación de dichos sujetos a los efectos de que se encontraban en dicho lugar "bebiendo" era una que resultaba palpablemente falsa a la mera observación.

No tenemos duda alguna en nuestra mente de que la prueba antes reseñada constituye los "motivos fundados" que requiere la citada Regla 11(c) de Procedimiento Criminal, ante, para que un funcionario del orden público pueda proceder al arresto de un ciudadano en Puerto Rico. En otras palabras, somos del criterio que cualquier persona "ordinaria y prudente", ejerciendo "criterios de probabilidad y razonabilidad", y a base de los hechos antes mencionados, hubiera llegado a la conclusión de que estos dos (2) individuos en un momento determinado habían tenido, bajo su posesión y control, el cargamento de marihuana que había sido ocupado por la Policía, lo cual como es de todos conocido constituye un delito grave en nuestra jurisdicción.

■ No invalida de manera alguna la conclusión a la que llegamos el hecho de que dichos "motivos fundados" no fueran consecuencia de la observación, por parte del funcionario del orden público concernido, de unos hechos que ocurren coetánea o simultáneamente ante dicho funcionario. *En otras palabras, somos del criterio que nada impide que la determinación que sobre "motivos fundados" requiere el inciso (c) de la citada Regla 11 de Procedimiento Criminal,* ante —para que un funcionario pueda realizar un arresto sin orden judicial— *sea el resultado de la "suma acumulativa" de unos hechos que, aun cuando no ocurren simultáneamente, se desarrollan o fluyen en rápida sucesión dentro de un término de tiempo relativamente corto; en el presente caso, en un período aproximado de tres (3) horas.* Resolvemos que, bajo las *circunstancias específicas* del caso ante nuestra consideración, el agente Hernández *no* venía en la obligación de acudir ante un magistrado en busca de una orden judicial para efectuar el arresto del apelante Ruiz Bosch y el coacusado Rosario Ayala en la noche del 30 de marzo de 1982.

# III

Habiendo determinado que el arresto del apelante Ruiz Bosch y del coacusado Rosario Ayala efectuado por el agente Hernández fue uno legal, se *simplifica* un tanto la interrogante de si la prueba obtenida por el Estado como consecuencia del mismo es admisible en evidencia. Como se desprende de la relación que de los hechos hiciéramos, dicha "segunda categoría" de prueba consistió en: (1) la licencia y las llaves del vehículo Chevrolet Montecarlo, ocupados en una "cartera de mano" perteneciente al coacusado Rosario Ayala; (2) la identificación que de Rosario Ayala hiciera, en las oficinas de la División de Drogas, el testigo Tomás Pagán Marrero; (3) los resultados de los análisis que llevara a cabo el Estado en relación a los zapatos, y el fango incrustado en los mismos, del apelante Ruiz Bosch, y (4) la alegada "admisión" que Fernando Ruiz Bosch le hizo al Fiscal del Distrito de Aguadilla, luego de que éste supuestamente le hiciera las "advertencias de ley", a los efectos de que él había sido el piloto del avión accidentado.

En cuanto a la evidencia enumerada bajo los acápites primero y segundo, dados los planteamientos de las partes, no hay mucho que expresar. En cuanto a esta evidencia —consistente en la licencia y llaves del Chevrolet Montecarlo ocupadas en la persona del coacusado Rosario Ayala y la identificación que de éste se hiciera, como conductor del referido vehículo, en la División de Drogas de la Policía— la representación legal del apelante Ruiz Bosch se ha limitado, tanto durante el proceso celebrado a nivel de instancia como ante este Tribunal, a argumentar que dicha prueba no era admisible únicamente por razón de que fue el producto de un arresto ilegal; posición que hemos rechazado por ser ésta incorrecta en derecho.(3)

---

(3) No consideramos ni resolvemos —por razón de no haber sido objeto de planteamiento por ninguna de las partes— el punto de si el apelante Ruiz Bosch tenía capacidad legal (*standing*) para solicitar la supresión de la evidencia admitida relacionada con el coacusado Rosario Ayala. A esos efectos, véase sentencia y opiniones concurrentes emitidas en *Pueblo v. Rovira Ramos*, 116 D.P.R. 945, 946, 955 (1986).

■ Igual situación ocurre en cuanto a la evidencia consistente en el resultado de los análisis realizados en los zapatos, y el fango incrustado en éstos, del apelante Ruiz Bosch. La principal argumentación respecto a los mismos, por parte de la defensa, ha sido que dichos resultados no eran admisibles en evidencia por razón de la alegada ilegalidad del arresto efectuado. Dichos resultados, no hay duda, fueron correctamente admitidos en evidencia por el foro de instancia no sólo por razón de que el agente del orden público tenía motivos fundados para arrestar al apelante, sino que por razón de que la actuación a esos efectos por parte del Estado resulta ser una *permisible* en derecho. Véanse: *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986); *Cupp v. Murphy*, 412 U.S. 291 (1973); *Schmerber v. California*, 384 U.S. 757 (1966); *United States v. Weir*, 657 F.2d 1005 (1981); *Com. v. Gliniewicz*, 500 N.E.2d 1324 (Mass. 1986). El argumento esgrimido por el apelante a los efectos de que "[n]o se estableció la cadena de custodia de los forros y de los pedales del avión que permitiera la introducción de prueba pericial basada en un examen de los mismos", Alegato del acusado-apelante, pág. 5, contenido en su quinto señalamiento de error, argumento mediante el cual intenta atacar "colateralmente" la admisión en evidencia del resultado del análisis comparativo llevado a cabo entre el fango incrustado en las suelas de sus zapatos y los pedales correspondientes al asiento del piloto del avión accidentado, es uno inmeritorio a la luz de lo resuelto por este Tribunal en *Pueblo v. Bianchi Álvarez*, 117 D.P.R. 484 (1986). En relación con dichos objetos, *los cuales poseen unas características sumamente distintivas que los hacen fácilmente identificables*, ciertamente no era imprescindible que el Estado estableciera una rigurosa cadena de custodia.

En relación con el punto referente a la admisibilidad de la alegada "admisión" que le hiciera el apelante —estando bajo custodia policíaca— al Fiscal del Distrito de Aguadilla a los efectos de que él era el piloto del avión accidentado, argumenta la representación legal del apelante, en el alegato que radicara, que cometió error el foro de instancia al admitir la misma por razón de que "no se *especificaron* ni *describieron* en *forma alguna* 'las

advertencias' que le hizo el Fiscal Román, según declarado por el testigo de cargo, el Fiscal Auxiliar Francisco Acevedo Padilla" (énfasis suplido); esto es, que el tribunal de instancia admitió la misma meramente a base de una afirmación, de tipo genérico, del Fiscal Acevedo Padilla a los efectos que el Fiscal Román le había hecho las "advertencias de ley" al apelante Ruiz Bosch.

En *Pueblo en interés menor J.A.B.C.*, 123 D.P.R. 551, 561–562 (1989), expresamos, en lo pertinente, que:

> No debe haber la menor duda de que el derecho que tiene todo ciudadano que habita en nuestro país, ante una imputación de delito por parte del Estado a permanecer callado, a no incriminarse y que su silencio no pueda ser tomado en su contra —garantizado el mismo por el Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1— es uno de los derechos más trascendentales y fundamentales del derecho penal y procedimiento criminal que se practica en una democracia como la nuestra. Debido a ello es que las manifestaciones inculpatorias que realiza un sospechoso, sobre el cual se ha centralizado una investigación criminal o un imputado de delito, *únicamente son admisibles en evidencia cuando el Estado demuestra que dichas manifestaciones fueron precedidas por una renuncia voluntaria, consciente, e inteligente del derecho contra la autoincriminación. Miranda v. Arizona*, 384 U.S. 436, 444, 475 (1966); *Moran v. Burbine*, 475 U.S. 412, 421 (1986).
>
> Una renuncia del mencionado derecho es "voluntaria" *cuando la misma es realizada* sin que haya mediado intimidación, coacción o violencia por parte de los funcionarios del Estado en el procedimiento que culmina en la toma de la confesión. *Colorado v. Connelly*, 479 U.S. 157 (1986).
>
> Por otro lado, y en palabras del Tribunal Supremo federal, una renuncia de esta naturaleza puede ser considerada como una "consciente e inteligentemente" realizada *cuando el sospechoso o imputado de delito es informado, en forma apropiada,* del privilegio constitucional contra la autoincriminación; incluyendo *la advertencia crucial* de que cualquier manifestación que haga al respecto podrá ser usada en su contra en un proceso criminal. *Colorado v. Spring*, 107 S. Ct. 851 (1987).
>
> Un análisis de nuestra jurisprudencia revela que hemos exigido —para que una renuncia al derecho constitucional contra la autoincriminación se considere como una realizada en forma "consciente e inteligente"— que el Estado le informe, de manera eficaz,[6]

al sospechoso o imputado de delito las siguientes advertencias: que tiene el derecho a permanecer callado; que cualquier manifestación que haga podrá ser utilizada como evidencia en su contra; que tiene el derecho a consultar con un abogado de su selección antes de decidir si declara o no y contar con la asistencia de éste durante el interrogatorio, y que de no tener dinero para pagar un abogado, el Estado viene en la obligación de proveérselo. *Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765 (1965); *Pueblo v. De Jesús Cabrera*, 94 D.P.R. 450 (1967); *Pueblo v. Chaar Cacho*, 109 D.P.R. 316 (1980); *Pueblo v. Ríos Álvarez*, 112 D.P.R. 92 (1982); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986).

*A los fines de determinar si esa renuncia al derecho contra la autoincriminación es o no una válida en derecho, los tribunales deben examinar la "totalidad de las circunstancias" que rodearon la confesión obtenida por los funcionarios del Estado.*

---

(6) Los funcionarios del Estado no cumplen con su obligación de informale al sospechoso o acusado de su derecho contra la autoincriminación en una "forma eficaz", haciendo dichas advertencias en *forma mecánica*, con el único propósito de cumplir con el requisito de las advertencias. *Pueblo ex rel. F.B.M.*, 112 D.P.R. 250, 252 (1982); *Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765 (1965). (Énfasis suplido y en el original.)

■ Realmente no podemos concebir de qué otra forma —que no sea exigiendo que el Ministerio Fiscal desfile *prueba detallada sobre las advertencias específicas* que se le hicieron al sospechoso y *sobre las condiciones imperantes en el momento* en que éste hizo la admisión o confesión— puede un tribunal de justicia determinar, a base del criterio de la "totalidad de las circunstancias", si la renuncia a ese derecho fundamental contra la autoincriminación fue una hecha en forma "voluntaria, consciente e inteligente". Así *específicamente* lo resolvimos en *Pueblo v. Pellot Pérez*, 121 D.P.R. 791 (1988). Expresamos, claramente, en esa ocasión que en esta clase de situaciones *le corresponde al Estado* "el *peso de la prueba de demostrar* que se hicieron las advertencias legales y que el acusado renunció a sus derechos [a no incriminarse] de forma voluntaria mediante un abandono intencional e inteligente" del mencionado derecho contra la autoincriminación. (Énfasis suplido.) Íd., pág. 802.

■ No debe haber duda, en consecuencia, que antes de que el Ministerio Fiscal presente prueba sobre la admisión, o confesión, extrajudicial realizada por un imputado de delito, éste viene en *la obligación* de desfilar prueba detallada y específica sobre los aspectos a los que hemos hecho referencia anteriormente. *Dicha obligación, por razones obvias, la tiene el Estado tanto en casos que se celebren por tribunal de derecho como en casos en que el juzgador de los hechos sea el Jurado. No hay razón legal válida alguna para establecer una distinción, en cuanto a este punto, entre un juicio por jurado y uno por tribunal de derecho. El derecho a ser protegido es el mismo en ambas situaciones.*[4]

Ello no obstante, debemos resolver —*a la luz de los hechos específicos y particulares acontecidos a nivel de instancia*— si efectivamente cometió error dicho foro, *que amerite nuestra intervención*, al admitir prueba sobre la alegada admisión sin que el Ministerio Público antes presentara prueba sobre las advertencias específicas que supuestamente le hiciera el Fiscal Román al apelante.

La correcta solución de dicha interrogante hace necesario que acudamos a lo que aconteció a nivel de instancia, según ello surge de la transcripción de los procedimientos que ordenáramos. El testimonio a través del cual el Ministerio Público introdujo en evidencia la admisión en controversia lo fue el prestado por el

---

[4] Debe mantenerse presente, naturalmente, en relación con esta situación, las disposiones de la Regla 9 de Evidencia, incisos (C), (D) y (E), 32 L.P.R.A. Ap. IV, la cual, en lo pertinente, dispone:

"*Regla 9. Determinaciones preliminares a la admisibilidad de evidencia*

"(C) *En casos ventilados ante jurado,* toda la evidencia relativa a la admisibilidad de una confesión del acusado será escuchada y evaluada por el juez en ausencia del jurado. Si el juez determina que la confesión es admisible, el acusado podrá presentar al jurado, y el ministerio público refutar evidencia pertinente relativa al peso o credibilidad de la confesión y a las circunstancias bajo las cuales la confesión fue obtenida. Otras determinaciones preliminares a la admisibilidad de evidencia también podrán ser consideradas en ausencia del jurado cuando los intereses de la justicia así lo determinen o cuando el acusado es un testigo que así lo solicite.

"(D) El acusado que testifica en torno a una cuestión preliminar a la admisibilidad de evidencia, no queda por ello sujeto a contrainterrogatorio en cuanto a otros asuntos del caso.

"(E) Esta regla no limita el derecho de las partes a introducir evidencia ante el jurado que sea pertinente al valor probatorio o la credibilidad de la evidencia admitida luego de la correspondiente determinación preliminar por el juez." (Énfasis suplido.)

Fiscal Auxiliar Francisco Acevedo Padilla. Un examen de dicho testimonio demuestra que dicho funcionario declaró, *en lo pertinente*, lo siguiente:

TESTIGO:

R O sea, yo me acuerdo del 31 de marzo. El 31 de marzo, en la mañana, yo recibí una llamada del Fiscal Román para que tan pronto llegara a Aguadilla, eh, me personara a un lugar de, donde habían ocurrido unos hechos en una avioneta que habían ocupado marihuana.

P Eh, esa avioneta, ¿sabe usted, más o menos, en qu[é] lugar se encontraba, si en algún lugar?

R En la finca Labadí.

. . . . . . . . .

P ¿Y usted? Sabe usted, más o menos, ¿cómo era el lugar donde aterrizó esa avioneta, si de alguna forma?

R Sí, era una pista, una pista privada, de hecho, posteriormente yo entrevisté al señor Labadí, que era el dueño de esa finca.

. . . . . . . . .

FISCAL VÁZQUEZ:

P . . . esa avioneta, en ese lugar, ¿qué ocurrió posteriormente, si algo ocurrió?

R Bien, eh, luego de que el Fiscal Román entrevistara allí a un agente de aduana, nos fuimos con el Fiscal Román hacia el Cuartel de Droga de Aguadilla. El Fiscal Román, el Fiscal Bernardo Muñiz y yo. Cuando yo llegué al Cuartel de, al Cuartel de Aguadilla, a la División de Droga de Aguadilla, observé cuando habían, observé cuatro personas que estaban en asientos separados dentro del cuartelillo. La forma en que estaban vestidos, etc., *entre las personas que estaban allí, observé al señor aquí presente en el día de hoy* .

. . . . . . . . .

P Si, no, decía usted que vestía, ¿cómo?

R Sí, si mi memoria no me es infiel, tenía una camisa azul clara y unos mahones. Se ve en los mahones que están, que están como enfangados y que tenía como. . .

P Se está señalando la parte inferior del pantalón, cuando dice enfangado.

HON. JUEZ:

Sí.

LCDO. MONSERRATE:

Sí.

R La parte inferior del pantalón.

HON. JUEZ:

La parte inferior del pantalón.

TESTIGO:

R Esa yerba que se le pega a los pantalones, también observé que tenía eso. No s[ó]lo él, los cuatro tenían.

HON. JUEZ:

En ambas patas del pantalón.

TESTIGO:

R En ambas, sí.

FISCAL VAZQUEZ:

P ¿Y qué pasó allí, si algo pasó, cuando usted vio estas personas allí en el cuartel?

TESTIGO:

R El Fiscal Román, eh, como estaban . . . ,no se hablaban entre ellos mismos, un silencio total. *El Fiscal Román llamó en primera instancia al señor Ruiz Bosch y lo llevaron a un cuarto que era de la oficina del Sargento Castro. Allí estaba el Fiscal Bernardo Muñiz, Corpus Hernández, el Fiscal Román y yo.*

. . . . . . . .

R El Fiscal Román, el Fiscal Bernardo Muñiz, el Agente Corpus Hernández, el Teniente Vargas, (Q.P.D.) y entonces, entró el señor Ruiz Bosch.

P Bien. ¿y que sucedió allí, si algo sucedió?

R Bien. *El Fiscal Román entrevista a este señor, le hace las advertencias y empiezan a hablar en términos de . . . , el Fiscal Román es piloto, eh . . . le pregunta su nombre, eh, le pregunta, si él era el piloto, él le dice que sí, que era el piloto, luego de eso . . .*

FISCAL VAZQUEZ:

P *Y cuando usted dice: 'Le pregunta que si él era el piloto', si él era el piloto, ¿de qué?*

R *Del avión, del avión, de un avión que se había caído en la, en la finca Labadí.*

P En la finca Labadí. ¿Y sabe usted cuando se, se cayó ese avión en la finca Labadí?

LCDO. MONSERRATE:

No, objeción. No hay base, ninguna, para que él pueda esa . . .

. . . . . . . . .

FISCAL VAZQUEZ:

P Bien. Eh, cuando dice usted que el, el compañero, eh, [é]l pregunta sobre, eh, *¿qué admisión, si alguna, es la que le hace esta persona, si . . .*

LCDO. MONSERRATE:

*Objeción, altamente subjetiva* [sic].

FISCAL VAZQUEZ:

¿Qué, qué contesta, si algo, . . .

HON. JUEZ:

*Un momentito, un momentito, s[í] compañero, está siendo sujestivo* [sic].

FISCAL VAZQUEZ:

Si, no, no, V.H., la hemos fra . . . , la vamos a frasear, la vamos a frasear.

HON. JUEZ:

Sí, vamos a pedirle que la frasee en otra forma, que está siendo sujestivo [sic].

FISCAL VAZQUEZ:

P La vamos a frasear, tiene razón, V.H. *Eh, testigo, a las preguntas, eh, que le hace el compañero, eh, Luis A. Román, ¿qué contestación, si alguna, es la que le brinda, eh, la persona que está allí presente con ustedes?*

R *El Fiscal Román le pregunta, si él era el piloto del avión que se había caído en la finca Labadí. El le contesta que sí, que había tenido problema, inclusive, que había tenido problema con la gasolina, entonces, el Fiscal Román, se vuelve a preguntarle, de. . . gasolina porqué, si usted acaba de pasar por Borinquen, entonces, él se calla y no dice nada más, en eso intervengo yo, el Fiscal Román me dice: 'sigue entrevistándolo tú'. Le vuelvo hacer las advertencias de derecho, inclusive, cuando le estaba hablando, eh, del derecho a asistencia de abogado, él me dice: 'no, mi papá es abogado no se preocupe'.*

P *¿Qué qui[é]n?*

R *Me dijo a mí, que el papá era abogado. Le pregunto yo a él, mire nosotros estamos haciendo una investigación sobre, sobre una avioneta que se cayó, la cual usted acaba de decir que es el piloto.* Sobre esa avioneta nosotros le tenemos que decir a usted que hemos ocupado una marihuana y dentro del avión que usted dice que es el piloto, se ocupó residuos de marihuana. Nosotros queremos que usted nos diga y coopere con nosotros en cuanto a esta investigación. *El dice, mire, lo único que yo, lo único que yo voy a decir es, que yo era el*

*piloto, yo no conozco las personas que están ahí y no voy a decir nada más.*

P *Eso sería todo, V.H., con relación al testigo.* (Énfasis suplido.) T.E., págs. 14–22.

De una simple lectura de lo antes reseñado surge, en primer lugar, que es enteramente correcta la aseveración de la defensa a los efectos de que durante el proceso que se celebrara a nivel de instancia se permitió que el Ministerio Público introdujera en evidencia prueba sobre la admisión extrajudicial alegadamente hecha por el apelante *sin* que el Fiscal antes hubiera demostrado, mediante prueba detallada y específica a esos efectos, las circunstancias en las cuales se produjo la admisión en controversia y cuales habían sido las advertencias de ley que le habían sido transmitidas al apelante con el propósito de demostrar que la renuncia de éste a no incriminarse fue una efectuada en forma voluntaria, consciente e inteligente. *No hay duda alguna, en consecuencia, que el tribunal de instancia erró al así permitirlo. Pueblo v. Pellot Pérez,* ante.

Por otro lado, igualmente surge de lo antes transcrito que dicha errónea actuación judicial con toda probabilidad se debió a que la representación legal del apelante a nivel de instancia *no objetó* en forma alguna el proceder del Ministerio Fiscal. Dicha situación trae a nuestra atención las disposiciones de las Reglas 4 y 6 de Evidencia, 32 L.P.R.A. Ap. IV. La primera de ellas dispone que:

No se dejará sin efecto una determinación de admisión de evidencia ni se revocará sentencia o decisión alguna por motivo de admisión errónea de evidencia a menos que:

(1) La evidencia fue erróneamente admitida *a pesar de la oportuna y correcta objeción* de la parte perjudicada por la admisión, y

(2) el tribunal que considera *el efecto* de la admisión errónea entiende que ésta *fue factor decisivo o sustancial* en la sentencia o decisión cuya revocación se solicita. (Énfasis suplido.)

El propósito u objetivo que persigue la transcrita Regla 4 de Evidencia, al exigir la "oportuna y correcta objeción"

de la evidencia por la parte perjudicada por la introducción de la misma, no sólo resulta ser obvio sino que altamente beneficioso a una eficiente y sana administración de la justicia. Dicho requisito, naturalmente, ayuda a evitar que los tribunales de instancia incurran innecesariamente en errores relativos a la admisión de evidencia al contar éstos, a tiempo, con una correcta exposición del derecho aplicable conforme el mejor criterio y conocimiento de los abogados de las partes. Ello tiene el efecto no sólo de promover la celebración de procesos justos y la emisión de sentencias correctas en derecho sino que impide el mal gasto de tiempo y recursos económicos al ayudar a reducir a un mínimo la posibilidad de que las sentencias dictadas sean anuladas en revisión por los tribunales apelativos, lo cual tiene la consecuencia indeseable de tener que ordenarse la celebración de un nuevo proceso. Demostrado por la parte afectada, por la errónea admisión de evidencia a nivel de instancia, que efectivamente interpuso "oportuna y correcta objeción" a la misma, tendrá entonces el tribunal apelativo el deber de determinar si la admisión errónea de dicha evidencia "fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita".(5) 32 L.P.R.A. Ap. IV.

_____

(5) Somos del criterio que el término clave en el inciso (2) de la transcrita Regla 4 de Evidencia, 32 L.P.R.A. Ap. IV, lo es la palabra "factor". ¿Qué significa el que una evidencia erróneamente admitida haya sido *factor decisivo o sustancial* en la *sentencia* o decisión cuya revocación se solicita? A nuestro juicio la contestación es sorprendentemente sencilla. Entendemos que definitivamente no nos podemos *limitar meramente* a cuestionarnos si existe otra prueba que a juicio del tribunal apelativo demuestra la culpabilidad del apelante más allá de duda razonable. El criterio que debe utilizarse —independientemente de la existencia de esa otra prueba— *en casos "ordinarios" de errores en la admisión de evidencia* es si de no haberse admitido erróneamente la prueba en controversia "probablemente el resultado hubiera sido distinto". *Pueblo v. Mangual Hernández*, 111 D.P.R. 136, 145 (1981). *Esto es, si la evidencia erróneamente admitida puede haber tenido una influencia notable, determinante, y hasta desmedida, en la mente del juzgador de los hechos en relación con el veredicto, fallo o sentencia que el mismo emitiera en el caso,* sea este civil o criminal. Véase *Kotteakos v. United States*, 328 U.S. 750 (1946).

El caso específico ante nuestra consideración envuelve uno de los errores que el Tribunal Supremo de los Estados Unidos clasifica como "error constitucional". Véase ·*Chapman v. California*, 386 U.S. 18 (1967). Como es sabido, en dicho caso el Supremo federal resolvió que cuando se trata de un "error constitucional", para que el mismo pueda ser considerado como uno "no perjudicial" por el tribunal apelativo, dicho foro tiene que estar convencido de ello "más allá de duda razonable". En *Pueblo v. Pellot Pérez*, 121 D.P.R. 791 (1988), caso en que la defensa había objetado oportunamente la prueba erróneamente admitida, resolvimos que el Estado —que resultaba ser el "beneficiario" del

En el presente caso *no* se cumple con el primero de los dos (2) requisitos que establece la transcrita Regla 4 de Evidencia para que se pueda dejar sin efecto, o revocar, una sentencia por razón de la errónea admisión de evidencia. Como quedara plenamente demostrado, la defensa en este caso *no* interpuso "oportuna y correcta objeción", íd., a la evidencia sobre la admisión. *Dicha situación hace inaplicable la citada Regla 4 a los hechos de este caso.*

Ello no dispone, sin embargo, de la situación planteada. Debemos, *obligatoriamente*, considerar las disposiciones de la Regla 6 de Evidencia, ante, la cual establece, *en lo pertinente*, que nada de lo dispuesto en la antes transcrita Regla 4 "impedirá que un tribunal apelativo considere *errores crasos y perjudiciales* de admisión . . . de evidencia, *a pesar de no haber mediado oportuna objeción*, cuando el no corregir dichos errores *resulte en un fracaso de la justicia*". (Énfasis suplido.)

■ El criterio (*test*) que establece la antes transcrita Regla 6 de Evidencia, aplicable a situaciones en que la evidencia erróneamente admitida no fue oportuna y correctamente objetada, *¿es uno diferente a, y más riguroso que, el establecido por la Regla 4 que hace que la probabilidad de que se anule la sentencia emitida sea menor que cuando se trate de la situación en que dicha evidencia fue oportuna y correctamente objetada?* Somos de la opinión que la contestación a dicha interrogante *tiene* que ser en la afirmativa.

No puede perderse de vista que la omisión en que incurre un abogado al no objetar una prueba que era inadmisible en evidencia puede ser el producto de variadas y diversas razones. Ello, entre otras, puede ser consecuencia de una estrategia forense legítima(6) como también puede ser el resultado de una táctica

---

"error constitucional" cometido— venía en la obligación de probar más allá de duda razonable que el error no tuvo ese efecto.

(6) En muchas ocasiones el abogado no objeta la prueba inadmisible que presenta la otra parte por razón de que ello le permite —o le "abre las puertas" a— la presentación de evidencia favorable a la causa que representa, evidencia que de otra forma no podría presentar. En otras instancias, el abogado no objeta el testimonio inadmisible sobre un

forense "ilegítima".(7) Dicha omisión, por otro lado, puede adicionalmente deberse tanto al desconocimiento del derecho aplicable por el abogado de la parte como también es factible que ello sea el resultado de un informado error de juicio.

*Es por ello que el legislador seguramente entendió que el tribunal apelativo* —al enfrentarse al incumplimiento del abogado de una parte de su deber de exponer, oportuna y correctamente, su visión del derecho respecto a la admisión en evidencia de determinada prueba; ante la incapacidad del tribunal para determinar con certeza la razón o fundamento de la referida omisión; y ante las normas jurisprudenciales imperantes en nuestra jurisdicción a los efectos de que las partes en un proceso responden por la actuación de sus abogados y de que las objeciones que no se realizan a tiempo se entienden renunciadas— *debe de estar facultado para aplicar a esta clase de situación un criterio ("test") mucho más estricto que el prescrito en la Regla 4 de Evidencia*, ante. El resultado de ese proceso de razonamiento legislativo lo es la vigente Regla 6 de Evidencia, ante.

Aclarado ese extremo, procede que frontalmente nos enfrentemos, y resolvamos, la interrogante de si el error cometido por el foro de instancia en el presente caso al admitir en evidencia la alegada admisión del apelante *es tan "craso y perjudicial" que causa que se incurra, de no revocarse la sentencia apelada, en un "fracaso de la justicia"*. ¿En qué situaciones debe ser aplicado este criterio? ¿En qué se diferencia el mismo del criterio de "factor decisivo o sustancial" contenido en la antes citada Regla 4 de Evidencia? ¿Qué significa el término, o qué debe entenderse por "fracaso de la justicia"?

Somos los primeros en admitir que intentar "definir" términos y palabras con connotaciones legales y tratar de delimitar las

---

hecho en particular con el propósito de poder "impugnar" a dicho testigo; ello con la "esperanza" de que el juzgador de los hechos descarte la totalidad del testimonio a base de la "teoría" de que "el que miente en lo poco, miente en lo mucho".

(7) En ocasiones, los abogados de las partes incurren —por omisión o acción— en la reprochable práctica de inducir a error a los tribunales de instancia respecto a la admisibilidad o no de una evidencia en particular con el propósito precisamente de "crear un récord de errores" que le permita lograr un nuevo juicio en la alternativa de que el resultado final del caso no le sea favorable.

situaciones en las cuales determinado "criterio" (*test*) es o no aplicable no sólo es una tarea compleja y difícil sino que peligrosa. Debe mantenerse presente que al definir se corre el riesgo de, inadvertida y erróneamente, incluir o excluir situaciones. La tarea se complica aún más por razón de que, en relación con la *aplicación específica* de la citada Regla 6 de Evidencia, nuestra jurisprudencia no resulta de mucha ayuda. Únicamente hemos podido localizar una sola decisión en que específicamente aplicamos la Regla 6 de Evidencia, *ante*, a los hechos de un caso —*Pueblo v. Carrión Rivera*, 111 D.P.R. 825, 829 (1981)— la cual, desafortunadamente no resulta ser muy ilustrativa sobre el tema que atendemos en el día de hoy.[8] La jurisprudencia anterior a la vigencia de las Reglas de Evidencia de 1979 principalmente se circunscribió a la interpretación de las disposiciones de la sec. 1171 de 34 de L.P.R.A. —todavía hoy vigente— y del "criterio" (*test*) de "error fundamental" contenido en la misma.[9] La jurisprudencia interpretativa de dicha disposición de ley, desafortunadamente, tampoco resulta ser de mucha ayuda en vista de las obvias diferencias existentes entre la terminología de dicha disposición legal y las de las Reglas 4 y 6 de Evidencia, *ante*, y, en adición, en vista de una ausencia de "uniformidad interpretativa"

---

(8) En el citado caso de *Pueblo v. Carrión Rivera*, 111 D.P.R. 825, 829 (1981), calificamos como un error "craso y perjudicial", la "corrección" del cual era necesario para evitar un "fracaso de la justicia", que el tribunal de instancia le hubiera permitido al Fiscal, sin objeción de la defensa, haber traído prueba sobre convicciones anteriores previas del allí imputado de delito en el contrainterrogatorio de un testigo que la defensa presentara y que había declarado en el directo exclusivamente sobre los "hechos" sucedidos. Resolvió el Tribunal, mediante opinión mayoritaria, que al amparo de la Regla 6 de Evidencia, 32 L.P.R.A. Ap. IV, tenía facultad para así resolver ya que no puede haber fracaso más grande de la justicia [cuando]. . . se conden[a] a una persona por hechos distintos de aquellos por los que se le está juzgando".

(9) "*Sec. 1171. Errores que no afectan derechos o que no fueron excepcionados; errores fundamentales*

"Siempre que resultare de los autos en alguna causa criminal apelada al Tribunal Supremo, que cualquier requisito legal haya sido desatendido por el tribunal sentenciador, no se anulará la sentencia, a menos que el error que de los autos resultare tendiere a perjudicar los derechos de cualquiera de las partes, y se hubiere interpuesto la debida excepción en el tribunal sentenciador; Disponiéndose, sin embargo, que el tribunal de apelación podrá conocer de errores fundamentales que aparecieren en los autos, aun cuando no se hubiere interpuesto objeción a ellos, y fallar sobre los mismos con arreglo al derecho que de los hechos se desprendiere." 34 L.P.R.A. sec. 1171.

por parte de este Tribunal respecto a la materia en consideración.[10] Ello no obstante, acometemos dicha encomienda.

■ De entrada, debemos expresar que parece inescapable la conclusión de que la prueba admitida erróneamente en el presente caso —consistente de la alegada admisión del apelante— cualifica como una "perjudicial" por lo que el error cometido prima facie cumple con el primero de los requisitos establecidos en la citada Regla 6 de Evidencia; esto es, de manera preliminar, estamos ante un error que puede ser considerado como uno "craso y perjudicial".[11] Establecida la existencia prima facie del error "craso y perjudicial", *¿resulta el mismo tan "craso y perjudicial" que procede la anulación de la sentencia apelada en el presente caso con el objetivo de evitar "un fracaso de la justicia"?* En la correcta solución de dicha interrogante resulta de cardinal importancia, *repetimos*, mantener bien presente el hecho de que por disposición legislativa a esos efectos las Reglas 4 y 6 de Evidencia, ante, no sólo *regulan situaciones diferentes* sino que *establecen criterios ("tests") distintos* para lidiar con dichas situaciones.

■ Bajo las disposiciones de la Regla 4 de Evidencia, ante, el tribunal apelativo debe determinar si la evidencia en controversia, la cual fue erróneamente admitida sobre la *oportuna y correcta objeción* de la parte perjudicada por la misma, fue o no *un factor decisivo o sustancial en el resultado del caso*; esto es, si dicha evidencia pudo haber tenido una influencia, notable y

---

[10] Por otro lado, el Prof. Ernesto L. Chiesa ha sido el único comentarista puertorriqueño que se ha expresado sobre el tema. Véase E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1983, Vol. I, págs. 4–10. En dichos comentarios, sin embargo, no se establece distinción alguna entre los diferentes "criterios" (*tests*) contenidos en las antes mencionadas Reglas 4 y 6 de Evidencia.

[11] En el presente caso, el Ministerio Público venía, antes de presentar prueba sobre la admisión, en la obligación de demostrar que se habían cumplido con todos y cada uno de los requisitos que exige la jurisprudencia aplicable a esta clase de situaciones. Al así no descargar su obligación a esos efectos, podemos "presumir" que no hubo renuncia válida por parte del apelante de su derecho constitucional contra la autoincriminación. Véanse, a esos efectos: *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Taque v. Louisiana*, 444 U.S. 469 (1980). El error que comete un tribunal en un proceso criminal al admitir evidencia obtenida en violación del derecho constitucional fundamental contra la autoincriminación ciertamente cualifica como uno "craso y perjudicial".

determinante, en el veredicto, fallo o sentencia que emitiera el juzgador de los hechos en el caso ante su consideración, fuera éste civil o criminal. A esos efectos, y en relación con procesos de índole penal, el tribunal apelativo deberá considerar, *entre otros*, los siguientes factores: si el proceso fue celebrado ante Jurado o por tribunal de derecho; si el resto de la prueba presentada por el Estado fue una de carácter circunstancial o, por el contrario, la misma consistió de evidencia directa; si el error cometido fue uno "ordinario" o, por el contrario, uno de los catalogados por el Tribunal Supremo de los Estados Unidos como "constitucional". Véase esc. 5 de esta opinión.

Al amparo de las disposiciones de la Regla 6 —*ante el incumplimiento* de la parte con su deber de objetar oportuna y correctamente la evidencia erróneamente admitida, e *independientemente* de la "influencia" que sobre el proceso decisorio pudiera haber tenido dicha evidencia— *la encomienda que nos atañe lo es la de decidir si ese resultado puede subsistir, no obstante el error "craso y perjudicial" cometido a nivel de instancia, por razón de que dicho resultado no ofende ni atenta contra los postulados y principios básicos de un sistema de justicia digno de una sociedad democrática como la nuestra.* En otras palabras, la función que debemos llevar a cabo se limita a determinar si —independientemente de la existencia del error "craso y perjudicial" y la influencia que el mismo pudo tener sobre el juzgador de los hechos— *el resultado del caso y la totalidad de las circunstancias en que se dio el mismo resultan ser compatibles con el ideal básico de justicia imperante en nuestra jurisdicción; esto es, la consecución de un "resultado" (sentencia) correcto en derecho luego de la celebración de un proceso justo e imparcial en que se observaron, cuando menos, las garantías mínimas del debido procedimiento de ley.*

Esa precisamente es la conclusión a la que hemos llegado luego de leer, y analizar, cuidadosamente la transcripción de los procedimientos acaecidos a nivel de instancia en el presente caso, transcripción que consta de cuatrocientas treinta (430) páginas.

Esto es, estamos convencidos "más allá de duda razonable", *Chapman v. California*, 386 U.S. 18 (1967), de que la sentencia apelada debe sostenerse por razón de que —no obstante haber incurrido en error el tribunal de instancia al admitir en evidencia la alegada admisión que éste hiciera ante los funcionarios del Estado— dicha sentencia, *a la luz de la totalidad de los procedimientos acaecidos a nivel de instancia,* es una correcta en derecho, la cual fue emitida en un proceso justo e imparcial, en el cual se le garantizaron al apelante las exigencias de un debido procedimiento de ley. Dicha sentencia, en resumen, no es ajena a, ni "estremece", nuestro sentido básico de justicia, *Pueblo v. Díaz Ríos,* 107 D.P.R. 140, 143 (1978), como tampoco trasciende la situación del caso particular ante nuestra consideración.

## IV

La restante evidencia presentada por el Estado, la cual constituye la "tercera categoría de evidencia" en que dividimos ésta para efectos de análisis y una mejor comprensión de la misma, consistió de la certificación expedida por la Administración de Aviación Federal a los efectos de que, conforme demostraban sus récord, en la noche del 30 de marzo de 1982 el piloto del avión accidentado lo era una persona que responde al nombre de "F. Ruiz". Dicha prueba constituye la "pieza que termina o completa el rompecabezas". No hay duda que, con excepción de la admisión que hiciera el apelante Fernando Ruiz Bosch, la prueba que presentara el Ministerio Fiscal en el presente caso es una de carácter circunstancial. Sabido es, sin embargo, que conforme establece el inciso (H) de la Regla 10 de Evidencia, 32 L.P.R.A. Ap. IV, "[c]ualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial"; que el elemento de "concierto y común acuerdo o designio común", como cualquier otro hecho en controversia, puede ser establecido mediante prueba indirecta o circuns-

tancial, *Pueblo v. Cancel Peraza*, 106 D.P.R. 28 (1977); ([12]) y que la evidencia circunstancial es *intrínsecamente igual* que la evidencia directa. *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 145 (1985).

Realmente resulta difícil imaginar prueba circunstancial más contundente y convincente que la presentada por el Estado durante el proceso que se celebrara en el presente caso. No tenemos duda alguna que conforme se fue desarrollando la misma a nivel de instancia, ante los ojos del juzgador —un experimentado magistrado— se fue creando, pieza a pieza, un "mosaico perfecto". La prueba presentada demuestra, fuera de toda duda razonable y posible, la culpabilidad del apelante Ruiz Bosch por el delito imputado de infracción al Art. 401(a)(1) de la Ley de Sustancias Controladas de Puerto Rico, 34 L.P.R.A. sec. 2401(a)(1); esto es, "posesión con intención de distribuir" setecientas ochenta y siete (787) libras de la sustancia controlada conocida como marihuana, actuando en concierto y de común acuerdo con otras personas.

## V

Habiendo determinado que no se cometieron los primeros cinco señalamientos de error, sólo nos resta por considerar el relativo a la pena de doce (12) años que le fuera impuesta al apelante. Sostiene éste, en síntesis, que erró el tribunal sentenciador al imponer dicha pena porque: la misma es una "equivocada"; no se tomó en cuenta en la imposición de la misma los "atenuantes" presentes en el caso, y dicha pena constituye "un castigo cruel, exagerado e injustificado". Dicho señalamiento de error es uno totalmente frívolo e inmeritorio. El apelante Ruiz Bosch fue declarado culpable y convicto de una infracción al Art. 401(a)(1) de la Ley de Sustancias Controladas de Puerto Rico, ante; esto es, "posesión con intención de distribuir" la sustancia

---

([12]) "Se entiende por evidencia indirecta o circunstancial aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual —en unión a otros hechos ya establecidos— puede *razonablemente inferirse* el hecho en controversia." (Énfasis suplido.) Regla 10(H) de Evidencia, 32 L.P.R.A. Ap. IV.

controlada conocida como marihuana. La pena de doce (12) años de prisión está comprendida dentro de los parámetros de la pena que en relación con el mencionado delito prescribe la referida Ley de Sustancias Controladas. Dicha pena, en consecuencia no es una "equivocada". Dados los hechos particulares del caso, somos del criterio que dicha pena no puede, ni debe, ser considerada como un "castigo cruel e inusitado" y una en relación con la cual el tribunal de instancia debió haber considerado la posibilidad de "atenuantes". De todas formas, reiteradamente hemos resuelto que la imposición de la pena es una que está supeditada a la sana discreción del tribunal sentenciador, actuación con la cual intervendremos únicamente cuando se nos demuestre que dicho foro ha incurrido en un claro abuso de discreción. *Pueblo v. Pérez Zayas*, 116 D.P.R. 197, 201 (1985). Este ciertamente no es el caso para así hacerlo.

Por los fundamentos antes mencionados, *se dictará sentencia confirmatoria de la emitida por el tribunal de instancia en el presente caso.*

La Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Alonso Alonso concurren con el resultado sin opinión escrita. El Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Hernández Denton se inhibieron.