EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Juan F. Torres Huertas<br><br>Recurrido | Certiorari<br><br>2025 TSPR 79<br><br>216 DPR ___ |

Número del Caso: CC-2024-0571

Fecha: 6 de agosto de 2025

Tribunal de Apelaciones:

    Panel I

Oficina del Procurador General

    Hon. Fernando Figueroa Santiago
    Procurador General

    Hon. Omar Andino Figueroa
    Procurador General

    Lcda. Mabel Sotomayor Hernández
    Subprocuradora General

    Lcda. Aracelis Burgos Reyes
    Procuradora General Auxiliar

    Lcda. Jynamarie Kuilan Santana
    Procuradora General Auxiliar

Representante legal de la parte recurrida:

    Lcda. Doris Carrero Ruiz
    Sociedad para Asistencia Legal

Materia: Derecho Procesal Penal – Admisibilidad de las declaraciones incriminatorias contenidas en las notas de un agente.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

       v.

                        CC-2024-0571

Juan F. Torres Huertas

    Recurrido

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 6 de agosto de 2025.

En esta ocasión, debemos resolver si el foro primario actuó correctamente al suprimir unas declaraciones incriminatorias realizadas por el recurrido bajo el fundamento de que este no renunció válidamente a su derecho a la no autoincriminación antes de ser interrogado por un agente estatal. El Tribunal de Apelaciones decidió no intervenir en ese dictamen. Por las razones que expondremos a continuación, revocamos la decisión recurrida y ordenamos la admisión en evidencia de las declaraciones incriminatorias contenidas en las notas del agente.

I

Por sucesos que ocurrieron el 4 de diciembre de 2020 en el Municipio de San Lorenzo, el Ministerio

Público presentó varias denuncias contra el Sr. Juan Francisco Torres Huertas. Entre otros delitos, se le imputó la comisión de dos asesinatos en primer grado, una tentativa de asesinato, conspiración, así como portación y uso ilegal de armas de fuego. Los hechos imputados violan los Artículos 93(a) y 244 de la Ley Núm. 146-2012, conocida como el Código Penal de Puerto Rico, 33 LPRA secs. 5142 y 5334, y los Artículos 6.05, 6.09 y 6.14(a) de la Ley Núm. 168-2019, conocida como la Ley de Armas de Puerto Rico, 25 LPRA secs. 466d, 466h y 466m. En esencia, se denunció al señor Torres Huertas por asesinar a los Sres. Alex E. Díaz y Jesús A. Elías Crespo y por haber atentado contra la vida del Sr. Francisco J. La Santa Lozada.

El 20 de enero de 2021, el Tribunal de Primera Instancia determinó causa para arresto en ausencia por los mencionados delitos. Dos días más tarde, agentes del Negociado de la Policía de Puerto Rico arrestaron al señor Torres Huertas y lo llevaron a la División de Homicidios de Caguas. Allí, el agente Anthony O. Egea Guardarrama, quien es el investigador de los asesinatos del caso de autos, interrogó al recurrido y obtuvo de él ciertas manifestaciones incriminatorias. Posteriormente, se celebró la vista preliminar en los días 23 de abril de 2021, 5 de mayo de 2021, 8 de junio de 2021 y 9 de junio de 2021. Luego de escuchar a las partes, el foro primario determinó causa probable para acusar al señor Torres Huertas de los siguientes delitos: (1) dos cargos por asesinato en primer grado, en violación del Art. 93(a) del Código Penal, supra; (2) un cargo por tentativa de asesinato en primer grado; (3) un cargo por infracción del Art. 244 del Código Penal, supra;

(4) seis cargos por violaciones del Art. 6.05 de la Ley de Armas, supra; (5) dos cargos por infracciones del Art. 6.09 de la Ley de Armas, supra, y (6) cinco cargos por violaciones del Art. 6.14(a) de la Ley de Armas, supra.

Una vez comenzado el juicio por jurado por las diecisiete acusaciones presentadas, el 9 de julio de 2024 el Ministerio Público solicitó que se admitieran en evidencia tres documentos: (1) las advertencias de ley realizadas al recurrido el 22 de enero de 2021 a las 12:45 p.m., por el agente investigador Egea Guardarrama; (2) las notas tomadas el mismo día por el agente Egea Guardarrama durante el interrogatorio del recurrido, y (3) las advertencias de ley hechas el 22 de enero de 2021 a las 6:12 p.m., por la Fiscal Auxiliar Lcda. Maribel Mojica Franceschi.

En desacuerdo con esta solicitud, el señor Torres Huertas requirió la celebración de una vista al amparo de la Regla 109(C) de las Reglas de Evidencia de Puerto Rico, infra, para determinar —en ausencia del jurado— la admisibilidad de los mencionados documentos.

Para dilucidar la controversia, el mismo 9 de julio de 2024 el Tribunal de Primera Instancia ordenó la celebración de la vista bajo la Regla 109(C) de Evidencia, infra. Consecuentemente, el agente Egea Guardarrama testificó sobre las advertencias de ley impartidas y las declaraciones incriminatorias tomadas y anotadas por él en la División de Homicidios de Caguas.

Luego de escuchar la prueba, el Tribunal de Primera Instancia determinó que los dos documentos de advertencias

realizados por el policía y la fiscal auxiliar sí eran admisibles. Sin embargo, **el foro primario no admitió en evidencia las notas tomadas por el funcionario del orden público, por lo que no podrían ser presentadas al jurado durante el juicio.**

Ante ello, el Ministerio Público solicitó una reconsideración. En sala, el foro primario explicó que la evidencia desfilada no demostró que la renuncia del acusado a su derecho contra la autoincriminación fue válida. Esto es, el foro de primera instancia entendió que el Estado no demostró que la renuncia fue voluntaria e inteligente. **Según fundamentó, nunca se presentaron las condiciones de salud del señor Torres Huertas —tanto físicas como mentales— luego de haber sido arrestado, al momento de hablar con el agente Egea Guardarrama y mientras estuvo bajo la custodia de la Policía de Puerto Rico.** Pese a ello, el foro primario "le concedió al Ministerio Público volver a interrogar al testigo para subsanar la carencia en demostrar la voluntariedad de la alegada renuncia a los derechos que le cobijan a todo sospechoso de delito". *Resolución*, Ap. del *certiorari*, pág. 81.

Por consiguiente, el 10 de julio de 2024 el agente Egea Guardarrama fue examinado por segunda ocasión. Empero, el Tribunal de Primera Instancia determinó nuevamente que la prueba del Ministerio Público no cumplió con los requisitos adoptados por esta Curia en Pueblo v. Millán Pacheco, 182 DPR 595 (2011), ya que, entre otras cosas, no se probó que la

renuncia fuera con conocimiento del derecho renunciado y de las consecuencias que ello pudiese acarrear.

Acto seguido, el Ministerio Público solicitó una resolución por escrito con el propósito de revisar la mencionada determinación. El 24 de julio de 2024, el Tribunal de Primera Instancia emitió una *Resolución* en la que recogió lo acontecido y plasmó el fundamento de su decisión.

En primer lugar, el foro primario consignó el testimonio del agente investigador. Indicó que "el agente Egea Guardarrama siendo el agente investigador del caso, se encontraba en la División de Homicidios cuando Torres Huertas llegó a la división y se le presentó identificándose y diciéndole que él investigaba el doble asesinato de la barriada La Marina de San Lorenzo, le tomó los datos generales a Torres Huertas y **le leyó las advertencias de ley**". (Negrilla suplida). *Resolución*, Ap. del *certiorari*, pág. 81. También apuntó que el agente se las explicó, que el arrestado dijo que no necesitaba abogado y que iba a cooperar. El miembro de la uniformada afirmó que el recurrido no estaba herido y lo describió como tranquilo, sereno y cooperador. Añadió que le preguntó cómo se encontraba y el recurrido contestó "bien dentro de la situación que estoy arrestado". Íd., pág. 84. **Seguidamente, le entregó al señor Torres Huertas el documento titulado *Advertencias Miranda para Persona Sospechosa en Custodia*. El sospechoso procedió a leerlo y firmarlo,** aunque le solicitó ayuda al agente para que escribiera su nombre y edad por él, ya que las esposas lo incomodaban.

El agente narró que, una vez brindadas las advertencias, el señor Torres Huertas le relató los asesinatos mientras él transcribía lo expresado en sus notas. El interrogatorio comenzó a las 12:50 p.m. y finalizó a la 1:52 p.m. del 22 de enero de 2021. **Tras concluir, el recurrido inició cada una de las páginas de las notas en donde se plasmó su confesión y luego las firmó.** Posteriormente, el agente investigador informó de lo acontecido a la Fiscal Auxiliar Mojica Franceschi, quien pocas horas después acudió a la Comandancia. Al llegar, la fiscal se dirigió al señor Torres Huertas, le hizo las advertencias nuevamente y le tomó una confesión bajo juramento a eso de las 6:12 p.m. Durante todo este proceso, el señor Torres Huertas se mantuvo tranquilo, tuvo acceso al servicio sanitario y a comida, la cual consumió en su totalidad.

En su *Resolución*, el Tribunal de Primera Instancia plasmó que, a preguntas de la defensa, el agente Egea Guardarrama no explicó por qué no se transportó inmediatamente el imputado al tribunal, según indica la Regla 22 de Procedimiento Criminal, 34 LPRA Ap. II. Además, señaló que, con relación a las advertencias de ley hechas por el agente investigador, inicialmente este no pudo identificar a ciencia cierta quién marcó los encasillados en los formularios que indican la renuncia inteligente a los derechos que le asisten a un sospechoso de crimen bajo custodia. No obstante, en la segunda vista el agente aseveró en su testimonio que fue el recurrido quien marcó los encasillados, además de afirmar que le leyó las advertencias y le entregó el documento de las advertencias

para su revisión y firma. El foro de primera instancia determinó que ambos testimonios eran inconsistentes entre sí.

Sobre las notas de la confesión, el foro primario también juzgó como inconsistente lo que el agente testificó en ambas vistas en cuanto a que el arrestado firmó las notas una vez terminó de transcribir las declaraciones. Sin embargo, del expediente surge que el agente declaró en ambas vistas que el señor Torres Huertas firmó las notas e inició cada una de las páginas. Empero, en la segunda vista el agente testificó asuntos adicionales, a saber: que le leyó al señor Torres Huertas todo el escrito al concluir el interrogatorio y que este aceptó el contenido de las notas.

Evaluado el testimonio, el Tribunal de Primera Instancia se reafirmó en que el Estado no fue capaz de demostrar que el arrestado renunció de manera voluntaria e inteligente a su privilegio constitucional. En síntesis, las razones para no admitir la confesión fueron las siguientes: (1) no se indagó sobre las condiciones físicas y mentales del señor Torres Huertas durante su arresto y mientras estuvo bajo custodia; (2) no se puso al tribunal en condiciones para apreciar si el acusado entendió las advertencias y no hubo indicios de que las entendió; (3) no se le informó al sospechoso la razón por la que estaba bajo custodia ni se le indicó las penas a las que se exponía; (4) no se presentó evidencia sobre lo ocurrido desde el arresto hasta llegar al lugar donde se interrogó el sospechoso, y (5) no se explicó por qué no se transportó inmediatamente a este último ante un magistrado, luego del arresto. Asimismo, pesó en el raciocinio del tribunal que el

agente aparentemente se contradijo al contestar quién hizo las marcas en el documento de las advertencias.

Por los fundamentos que anteceden, el foro primario determinó que la confesión tomada por el agente Egea Guardarrama no era admisible para ser presentada al jurado. A pesar de esto, las advertencias hechas por el agente, las advertencias realizadas por la fiscal Mojica Franceschi y la declaración jurada tomada ante ella sí podrían presentarse en el juicio.

En desacuerdo, el Ministerio Público acudió al Tribunal de Apelaciones por medio de un *certiorari* y una solicitud en auxilio de jurisdicción. Suplicó que se revocara la determinación del Tribunal de Primera Instancia y que, debido a que su petición era indispensable para la consecución de la verdad, el juicio no debía continuarse sin que el Pueblo tuviera la oportunidad de utilizar la mejor evidencia para demostrar la culpabilidad del aquí recurrido. El 16 de septiembre de 2024, el foro intermedio declaró No Ha Lugar la solicitud de auxilio de jurisdicción y denegó la expedición del auto de *certiorari*.

Todavía convencidos de que los tribunales inferiores erraron en su proceder, el Ministerio Público acude ante nos mediante una *Petición de certiorari* y una *Urgente solicitud en auxilio de jurisdicción*. En primer lugar, solicitó la paralización inmediata del juicio por jurado contra el señor Torres Huertas. Conjuntamente, levantó que el Tribunal de Primera Instancia incurrió en un craso abuso de discreción al denegar la admisión de las notas tomadas por el agente pese a

que la evidencia presentada demuestra que el recurrido ofreció su confesión de manera voluntaria e inteligente. Según el Procurador General, el foro primario centró su análisis de admisibilidad en exigencias que no encuentran soporte en el ordenamiento jurídico y que, lo que es más grave, ya han sido rechazadas por el Tribunal Supremo federal y por esta Curia. Bajo dicho fundamento, suplicó que revocáramos la determinación del foro primario de suprimir las notas del agente Egea Guardarrama.

Examinada la moción en auxilio de jurisdicción, intervenimos en esta etapa de forma excepcional el 19 de septiembre de 2024 y ordenamos la paralización del juicio ante el Tribunal de Primera Instancia. Posteriormente, expedimos el auto de *certiorari*. En oposición, el señor Torres Huertas sostiene que el Tribunal de Primera Instancia no erró en su determinación ni fundamentos.

Ahora, contando con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

II

**A. *Derecho contra la autoincriminación***

En Puerto Rico no se puede obligar a una persona a contestar preguntas o emitir expresiones que la expongan al riesgo de enfrentar responsabilidad criminal por esas manifestaciones. Pueblo v. Marrero, 213 DPR 404, 411 (2023); Pueblo v. Millán Pacheco, supra, pág. 608. Esto se debe a que ambas Constituciones, la de Estados Unidos y la de Puerto Rico, prohíben que el Estado coaccione a sus ciudadanos para que se expongan a responsabilidad criminal mediante su propio

testimonio. Véase, Emda. V, Const. EE. UU., LPRA, Tomo 1, pág. 191; Art. II, Sec. 11, Const. PR, LPRA, Tomo 1, pág. 359.

El derecho contra la autoincriminación, como comúnmente se le conoce, "ha venido a ser la protección más importante que ampara a la persona que es objeto de un interrogatorio como parte de una investigación criminal". E.L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, San Juan, Ed. Situm, 2017, pág. 52. Si una persona es compelida a incriminarse por medio de sus propias palabras, sus expresiones serán inadmisibles como evidencia en el juicio. Pueblo v. Marrero, supra, pág. 411; E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Bogotá, Ed. Forum, 1993, Vol. I, Sec. 2.1, pág. 56. Con ello, se fomenta que el Gobierno realice sus investigaciones criminales civilizadamente y que nuestro ordenamiento no se contamine con métodos para procurar la verdad que lesionen la dignidad humana. Pueblo v. Marrero, supra, pág. 412.

De forma similar a otras controversias que hemos atendido en el pasado, el caso que nos ocupa se enmarca en la alegada violación de lo dispuesto en el histórico precedente de Miranda v. Arizona, 384 U.S. 436 (1966), y su progenie. Véanse, por ejemplo, Pueblo v. Marrero, supra; Pueblo v. Millán Pacheco, supra, y Pueblo v. Viruet Camacho, 173 DPR 563 (2008). Y es que, aunque la protección constitucional contra la autoincriminación es perfectamente renunciable, para que dicha renuncia sea válida debe ser voluntaria, producto de una elección libre, a sabiendas del derecho abandonado y de las

consecuencias que acarrea ese abandono. Pueblo v. Viruet Camacho, supra, pág. 573.

En ese sentido, el caso Miranda v. Arizona, supra, págs. 444-445, establece que, en toda investigación criminal realizada por el Gobierno, una vez la pesquisa se centra en un sospechoso que se encuentra custodiado por agentes del orden público y estos, a su vez, están prestos a interrogarlo, los oficiales tienen que advertirle de ciertos derechos que le asisten constitucionalmente contra la autoincriminación y de su derecho a ser asistido por un abogado. Véase, Vega v. Tekoh, 597 U.S. 134, 149 (2022). De no hacerlo, la confesión obtenida será inadmisible como prueba de cargo en los tribunales, pues la garantía contra la autoincriminación requiere que el acusado esté informado de una manera adecuada y efectiva de su derecho y que este sea totalmente respetado. Íd., pág. 467; Pueblo v. Viruet Camacho, supra, pág. 571.

En la consecución de que el sospechoso esté informado de una manera adecuada y efectiva de sus derechos constitucionales, las reconocidas Advertencias Miranda exigen que se le informe —antes de ser interrogado— lo siguiente: (1) que tiene derecho a guardar silencio; (2) que cualquier declaración que haga podrá ser usada como evidencia en su contra; (3) que tiene el derecho a ser asistido por un abogado, y (4) que de carecer de recursos económicos para sufragarlo, tiene derecho a que el estado le asigne un abogado de oficio. Miranda v. Arizona, supra, págs. 444-445.

En el caso de marras, no existe duda de que el agente estatal debía comunicar las Advertencias Miranda al sospechoso

antes de interrogarlo. Esto es así porque las circunstancias fácticas lo exigían. A saber, la investigación criminal estaba centrada en el señor Torres Huertas cuando este fue arrestado y puesto bajo custodia el 22 de enero de 2021. Además, el agente Egea Guardarrama entrevistaría al sospechoso en aras de obtener declaraciones incriminatorias. Por todo lo anterior, estamos ante un escenario en el cual las salvaguardas procesales consignadas en Miranda v. Arizona, supra, debieron efectuarse.

En varias ocasiones hemos reafirmado que nuestro ordenamiento no exige que los funcionarios del orden público realicen una expresión específica o utilicen un lenguaje talismánico al momento de realizar las advertencias. Pueblo v. Marrero, supra, pág. 413; Pueblo v. Millán Pacheco, supra, pág. 611; Pueblo v. Viruet Camacho, supra, pág. 574. Lo importante es cumplir con el propósito de que el detenido entienda lo que implica su renuncia al derecho contra la autoincriminación. Pueblo v. Marrero, supra, pág. 413; Pueblo v. Viruet Camacho, supra, pág. 574.

**B. Admisibilidad de una confesión incriminatoria**

Si bien es cierto que la mejor evidencia para conectar a una persona con la comisión de un delito es su propia confesión, nuestro ordenamiento jurídico ha establecido varias medidas dirigidas a que la confesión no se logre vulnerando las garantías constitucionales de los ciudadanos. Véase, Pueblo v. Millán Pacheco, supra, págs. 607-608, citando a O.E. Resumil, *Derecho Procesal Penal*, Oxford, Butterworth Pubs., 1993, T. I, pág. 346. Una de estas medidas la encontramos en

la Regla 109(C) de Evidencia, 32 LPRA Ap. VI, la cual regula lo pertinente a las determinaciones preliminares sobre la admisibilidad de evidencia. Específicamente, esta regla dispone lo siguiente:

> **Regla 109. Determinaciones preliminares a la admisibilidad de evidencia**
>
> (A)  . . . .
> (B)  . . . .
> (C)  *Determinaciones en ausencia del Jurado cuando medie confesión de la persona acusada.* —En casos ventilados ante jurado, toda la evidencia relativa a la admisibilidad de una confesión de la persona acusada será escuchada y evaluada por la jueza o el juez en ausencia del jurado. Si la jueza o el juez determina que la confesión es admisible, la persona acusada podrá presentar al jurado, y el Ministerio Público podrá refutar, evidencia pertinente relativa al peso o credibilidad de la confesión y a las circunstancias bajo las cuales la confesión fue obtenida. Otras determinaciones preliminares a la admisibilidad de evidencia también podrán considerarse en ausencia del jurado cuando los intereses de la justicia así lo determinen o cuando la persona acusada sea un testigo que así lo solicite. <u>Íd</u>.

Tal cual podemos apreciar, es al Ministerio Público a quien le corresponde probar que la confesión efectuada constituye una renuncia válida al derecho contra la autoincriminación y, por lo tanto, es admisible en evidencia. <u>Pueblo v. Viruet Camacho</u>, <u>supra</u>, pág. 575. En otras palabras, para que la renuncia al derecho contra la autoincriminación sea válida, el Ministerio Público es quien tiene que evidenciar, mediante **preponderancia de la prueba**, que la renuncia del acusado fue voluntaria e inteligente. <u>Pueblo v. Millán Pacheco</u>, <u>supra</u>, pág. 612. Para ello, deberá "desfilar evidencia detallada sobre las advertencias específicas que se

le hicieron al sospechoso y sobre las condiciones imperantes en el momento en que éste hizo la admisión o confesión". Íd. No obstante, debe tenerse en cuenta que el estándar de preponderancia de la prueba no exige al Estado probar la renuncia del acusado con exactitud matemática, sino que basta con precisar aquellos hechos que, con mayor probabilidad, ocurrieron. Véase, Zambrana v. Hospital Santo Asilo de Damas, 109 DPR 517, 521 (1980).

En cuanto al concepto de voluntariedad, este deberá analizarse en dos vertientes: (1) **el abandono del derecho debe haber sido voluntario en el sentido de que sea producto de una elección libre y deliberada** y (2) **la renuncia debe hacerse con pleno conocimiento no solo del derecho abandonado, sino de las consecuencias de esa decisión.** Pueblo v. Medina Hernández, 158 DPR 489, 504 (2003). Asimismo, en el pasado hemos indicado que una renuncia se considerará voluntaria si es "realizada sin que haya mediado intimidación, coacción o violencia por parte de los funcionarios del Estado en el procedimiento que culmina en la toma de la confesión". Íd., citando a Pueblo v. Ruiz Bosch, 127 DPR 762, 775-776 (1991); Pueblo en interés menor J.A.B.C., 123 DPR 551, 561 (1989). Este elemento requiere un análisis de la **totalidad de las circunstancias.** Pueblo v. Marrero, supra, pág. 413; Pueblo v. Ruiz Bosch, supra, pág. 776. En Pueblo v. Marrero, supra, indicamos que algunos de los factores que se pueden utilizar para auscultar si una confesión se obtuvo de manera voluntaria son los siguientes:

> [S]i se impartieron las advertencias legales; la evaluación de las circunstancias personales y

particulares del sospechoso; el daño físico o psicológico infringido; el periodo de tiempo que estuvo bajo custodia previo a prestar la confesión, y la conducta de la policía mientras estuvo bajo custodia. Además, puede tomarse en cuenta si el declarante tuvo asistencia de un abogado al prestar la confesión; si hubo un interrogatorio ininterrumpido durante todo el día y la noche; si el interrogatorio estuvo a cargo de varios policías armados, o si se utilizó el sistema de turnos. Asimismo, se pudiera observar si, desde el arresto hasta la declaración, el detenido estuvo completamente incomunicado de sus familiares, amigos o personas ajenas a la policía; la presión producida por la presencia de un gentío hostil; la capacidad psicológica del sospechoso para resistir las presiones a las que estuvo sujeto, entre otras. Pueblo v. Marrero, supra, pág. 414.

Lo anterior demuestra que **el análisis acerca de la voluntad de la renuncia es uno que debe realizarse caso a caso y que ningún factor será concluyente por sí solo para determinar si la confesión es o no admisible**. Id., págs. 413-414.

Por su parte, el concepto de que la renuncia debe efectuarse de manera "consciente e inteligente" se satisface al **impartir correctamente las advertencias de ley con indicios de que el sospechoso entendió los derechos que le asisten durante el interrogatorio**. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, *op. cit.*, pág. 79. Véase, Pueblo v. Millán Pacheco, supra, pág. 611. Ahora bien, lo anterior no implica que el sospechoso debe tener conocimiento de todo lo que pudiera estar ocurriendo fuera del lugar del interrogatorio, ni que la Policía le tenga que brindar información que le ayude a calibrar su decisión de renunciar a sus derechos. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, *op. cit.*,

págs. 79-80. Así, por ejemplo, en Moran v. Burbine, 475 U.S. 412 (1986), se interrogó al arrestado tras impartírsele las advertencias de ley, pero sin informarle el hecho de que ya un abogado se había comunicado con la Policía para asistirlo. Sin embargo, el arrestado no solicitó asistencia de abogado y firmó el formulario de renuncia. De tal manera, sin conocimiento alguno de las gestiones que se hacían para que un abogado lo asistiera, hizo declaraciones incriminatorias. El Tribunal Supremo de Estados Unidos aclaró que no hubo violación del derecho contra la autoincriminación y determinó que los eventos que ocurran fuera de la presencia del sospechoso, que sean enteramente desconocidos por él, seguramente nada tienen que ver con su capacidad para comprender y renunciar con conocimiento al derecho constitucional. Moran v. Burbine, supra, pág. 413.

De hecho, en ese mismo caso, el Máximo Foro Judicial federal se expresó respecto al análisis a ser aplicado a la hora de determinar si existe una renuncia válida como cuestión de derecho:

> Once it is demonstrated that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, **the analysis is complete and the waiver is valid as a matter of law.** (Negrilla suplida). Id., pág. 413.

Entonces, si bien la voluntariedad de la renuncia depende de que se haga con pleno conocimiento, no solo del derecho abandonado, sino de las consecuencias de esa decisión, ello tampoco implica que el sospechoso debe tener conocimiento de todas las posibles consecuencias de su declaración para que la

renuncia sea válida. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, *op. cit.*, pág. 81. Por ejemplo, los agentes del orden público no están obligados a comunicarle sobre qué versará el interrogatorio o sobre qué delitos en específico se le preguntará. Íd. "Esto es, no revelarle al sospechoso sobre qué versará el interrogatorio es inconsecuente para la determinación de si hubo una renuncia válida a sus derechos". Íd. En sí, resulta meritorio aclarar que la Constitución no exige que el sospechoso conozca y entienda toda posible consecuencia de la renuncia a sus derechos. Colorado v. Spring, 479 U.S. 564, 574 (1987). Por eso, en el caso de marras el Tribunal de Primera Instancia erró al fundamentar su dictamen en que no se le informó al sospechoso la razón por la que estaba bajo custodia ni se le indicó las penas a las que se exponía. En palabras del profesor Chiesa:

> No se requiere que el interrogado esté informado de todo cuanto pudiera serle útil para su decisión de hablar o reclamar sus derechos. Todo cuanto exige *Miranda* es que se le advierta al sospechoso de sus derechos (las cuatro advertencias); nada más se exige para que la renuncia a los derechos se estime inteligente. "Resolvemos que el conocimiento del sospechoso de todo posible asunto del interrogatorio, antes de su inicio, no es relevante para determinar si el sospechoso renunció voluntaria e inteligentemente a su privilegio bajo la Enmienda Quinta" Colorado v. Spring, supra, pág. 577. (Traducción suplida). Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa*, *op. cit.*, pág. 82.

Ante este escenario, pasemos ahora a disponer de la controversia.

III

En el recurso ante nuestra consideración, el Estado arguye que el Tribunal de Apelaciones erró al negarse a expedir el auto de *certiorari*, a pesar de que el Tribunal de Primera Instancia incurrió en un craso abuso de discreción al denegar la admisión en evidencia de las notas incriminatorias tomadas por el agente Egea Guardarrama. Además, el Ministerio Público sostiene que el foro primario abusó de su discreción al exigir conocer las circunstancias en las que se arrestó al recurrido e impedir, a la vez, que se presentara el testimonio del agente que diligenció la orden de arresto, quien declararía precisamente sobre esas circunstancias. Le asiste la razón al Ministerio Público, lo que comprobamos al examinar la totalidad de las circunstancias que presentan los autos.

La controversia central que nos ocupa es determinar si el foro primario erró al declarar inadmisibles en evidencia las notas del agente bajo el entendido de que el Estado no demostró la validez de la renuncia del acusado a su derecho contra la autoincriminación. En lo pertinente, el foro primario concluyó que el Ministerio Público no logró demostrar la renuncia válida del señor Torres Huertas **porque nunca se le puso en condiciones para apreciar cómo el agente se aseguró de que el acusado comprendió las advertencias de ley.** En específico, en su *Resolución*, el Tribunal de Primera Instancia cuestionó la forma en que se leyeron al sospechoso las advertencias, cómo se le explicaron y si este las entendió al leerlas en el documento titulado *Advertencias Miranda para Persona*

*Sospechosa en Custodia*. No obstante, al examinar el expediente, nos vemos forzados a concluir en contrario.

De los autos, colegimos que el agente Egea Guardarrama le comunicó eficazmente al recurrido las debidas advertencias de ley antes de comenzar el interrogatorio en la Comandancia de Caguas. En concreto, durante la vista del 9 de julio de 2024 sobre admisión de evidencia, el oficial estatal sostuvo que mientras leía las advertencias de ley, el señor Torres Huertas asentía y le indicaba que las entendía. Ap. del *certiorari*, Anejo IV, min. 1:36:41-1:36:48. Cabe señalar que el agente leyó al sospechoso las advertencias de ley directamente del documento titulado *Advertencias Miranda para Persona Sospechosa en Custodia*, PPR 615.4. Además, explicó en su testimonio que el señor Torres Huertas específicamente marcó los encasillados que indicaban que ejerció su derecho a leer las advertencias por sí mismo, que entendía los derechos que estas le concedían y que renunciaba a estos voluntariamente y con pleno conocimiento. Íd., min. 1:41:12-1:41:50.

Por otra parte, en la vista subsiguiente del 10 de julio de 2024, el agente Egea Guardarrama testificó que le explicó al recurrido las advertencias de ley y, en particular, detalló que cuando le explicó que tenía derecho a un abogado, el señor Torres Huertas le interrumpió y le dijo que "[él] no [necesita] a ningún abogado". Ap. del *certiorari*, Anejo V, min. 21:45-21:50. Más aún, el agente sostuvo que, cuando le mencionó cada una de las advertencias de ley, el señor Torres Huertas le respondió "que [iba] a cooperar", que él sabía sus derechos, que "[él] no [necesitaba] a ningún abogado" y que "[él] sabía

que esto [le] iba a pasar". Íd., min. 26:40-27:05. Asimismo, no fue hasta luego de la explicación de las advertencias y de las expresiones mencionadas que, según el agente, el recurrido firmó el documento de *Advertencias Miranda para Persona Sospechosa en Custodia*.

En suma, surge del expediente que, luego de haber sido advertido de su derecho a la no autoincriminación, el señor Torres Huertas decidió declarar sobre los sucesos trágicos del 4 de diciembre de 2020. Llanamente, admitió en el interrogatorio que asesinó a dos personas con un arma de fuego. Cabe resaltar que cuando el agente le dijo al señor Torres Huertas que tomaría nota de lo que relataba, este le contestó que no había problema. Además, según el oficial, al culminar de anotar las declaraciones, le leyó al señor Torres Huertas las notas para asegurarse de que todo lo que escribió era fiel a su declaración, pero este no hizo correcciones. Acto seguido, el señor Torres Huertas inició cada una de las hojas de las notas y firmó al final de la declaración luego de que el agente así se lo pidiera.

Al evaluar la totalidad de las circunstancias que presenta el caso de autos, nada ensombrece la proposición de que la confesión del señor Torres Huertas fue inteligente. Por un lado, surge de los autos que este cuenta con un cuarto año de escuela superior. Por otro lado, según el testimonio del agente, el señor Torres Huertas nunca manifestó tener duda cuando escuchó las advertencias de ley, nunca expresó sentirse intimidado, nunca pidió parar la entrevista, ni pidió representación legal. Íd., min. 32:10-32:55. Más aún, el

recurrido reconoció con su firma tanto el documento con las advertencias de ley como las notas de sus declaraciones incriminatorias que el agente tomó.

Como mencionamos, una renuncia al derecho contra la autoincriminación requiere que el sospechoso entienda la naturaleza de los derechos y las consecuencias de la decisión de renunciar a ellos. En Pueblo v. Millán Pacheco, supra, expresamos que este requisito se satisface cuando se transmiten las *Advertencias Miranda* de forma eficaz. Además, el Tribunal Supremo federal ha expresado que **el análisis para examinar la validez de la renuncia al derecho contra la autoincriminación se completa cuando se determina que el sospechoso renunció a su derecho luego de que se le comunicaran correctamente las advertencias de ley y el sospechoso las entendiera.** Moran v. Burbine, supra, págs. 422-423. Aquí, no cabe duda de que el señor Torres Huertas fue advertido eficazmente de su derecho a no autoincriminarse y de las consecuencias que puede acarrear renunciar a este privilegio. Por lo tanto, es forzoso concluir que el Estado sí demostró que el señor Torres Huertas entendió los derechos que le cobijan bajo la cláusula de la protección contra la autoincriminación.

Asimismo, se desprende del expediente que no hay elementos de coacción estatal que anulen la voluntad del señor Torres Huertas para renunciar a su derecho. Observamos que, referente a la línea de tiempo, el agente Egea Guardarrama testificó que el arresto se dio en horas de la mañana del 22 de enero de 2021, que le hizo las advertencias de ley a las 12:45pm del

mismo día, que entre las advertencias y el comienzo del interrogatorio pasaron solo minutos y que el interrogatorio no duró más de dos horas. A esto añadimos que, según surge del expediente, el señor Torres Huertas se mantuvo tranquilo y cooperador durante el interrogatorio. Incluso, a preguntas de la defensa en la vista del 9 de julio de 2024, el agente Egea Guardarrama respondió que al sospechoso se le ofreció la oportunidad de llamar a un familiar, pero el señor Torres Huertas declinó. Ap. del *certiorari*, Anejo IV, min. 3:04:04-3:04:16. Así, se hace patente que el ambiente del interrogatorio fue uno sosegado y libre de opresión mental y física hacia el sospechoso. Por lo demás, el propio Tribunal de Primera Instancia dictó en su *Resolución* que "[d]urante la vista no se presentó evidencia de coerción alguna [en el transcurso del interrogatorio]". Ap. del *certiorari*, pág. 88. Por consiguiente, estamos convencidos de que el Estado demostró que la renuncia del señor Torres Huertas a su privilegio constitucional fue libre de coacción estatal. Véase, Pueblo v. Millán Pacheco, supra, pág. 611.

Antes de finalizar, señalamos que el Tribunal de Primera Instancia incurrió en un abuso de discreción al requerir prueba de las condiciones físicas y mentales del señor Torres Huertas durante su arresto y mientras estuvo bajo custodia. No debe perderse de vista que el examen de la renuncia al derecho contra la autoincriminación ha de realizarse bajo el estándar probatorio de la preponderancia de la prueba. Pueblo v. Millán Pacheco, supra, pág. 612. En consecuencia, **en ausencia de un signo aparente que demostrara que el señor Torres Huertas**

**sufría de alguna condición o alteración de estado mental que anulara su consciencia o voluntad, el Ministerio Público no venía obligado a evidenciar el estado o las condiciones del sospechoso para sostener la validez de la renuncia.** Aseverar lo contrario implicaría elevar el estándar probatorio de preponderancia de la prueba a uno más robusto que requiera del Estado eliminar toda posibilidad de enajenación mental o volitiva. Además, la condición física o mental del sospechoso no es más que un factor adicional que debe analizarse a la luz de la totalidad de las circunstancias. Esto es, una enajenación mental o volitiva por sí sola no es concluyente para determinar si la confesión es o no admisible. Véase, por ejemplo, United States v. Mattox, 27 F.4th 668, 675 (8th Cir. 2022) (donde el tribunal determinó que el estar bajo los efectos de analgésicos no es suficiente para anular la voluntad del sospechoso si hay prueba de que respondió razonablemente y comprendió lo que estaba ocurriendo); Dillon v. Commonwealth, 475 S.W.3d 1 (Ky. 2015) (donde se entendió voluntaria la confesión dada mientras el sospechoso estaba severamente herido por no demostrarse interrogación impropia); Delao v. State, 235 S.W.3d 235 (Tex. Crim. App. 2007) (donde el tribunal sostuvo que las capacidades mentales son un factor para evaluarse dentro de la totalidad de las circunstancias); Commonwealth v. Boyarsky, 452 Mass. 700, 897 N.E.2d 574 (2008) (donde se entendió voluntaria la confesión a pesar de que el sospechoso padecía de ataques de pánico, ya que no se observó ningún síntoma durante el interrogatorio); Reese v. State, 371 Ark. 1, 262 S.W.3d 604 (2007) (donde el tribunal dictó que el hecho de que el

sospechoso pudiera haber estado intoxicado en el momento en que prestó la declaración no la hace inadmisible automáticamente).

Así pues, concluimos que del expediente surge prueba suficiente para determinar que la renuncia del recurrido al derecho contra la autoincriminación fue voluntaria e inteligente. Por ello, es forzoso concluir que la confesión es admisible en evidencia. Los fundamentos antes expuestos son, no solo necesarios, sino suficientes para adjudicar la controversia de marras. De tal manera, en cuanto al segundo señalamiento de error, dictamos que, a la luz de la totalidad de las circunstancias, la prueba referente al diligenciamiento del arresto del señor Torres Huertas no guarda relación con la admisión de sus declaraciones incriminatorias.

IV

Por los fundamentos antes expuestos, se revoca el dictamen del Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos, de forma compatible con este dictamen.

Se dictará sentencia en conformidad.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Peticionario

      v.                CC-2024-0571

Juan F. Torres Huertas

    Recurrido


SENTENCIA


En San Juan, Puerto Rico, a 6 de agosto de 2025.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, se revoca el dictamen del Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos, de forma compatible con este dictamen.

Lo acordó el Tribunal y lo certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Candelario López emitió una Opinión de conformidad. La Jueza Presidenta Oronoz Rodríguez disiente sin opinión escrita y se une a las expresiones de los Jueces Asociados señores Estrella Martínez y Colón Pérez. El Juez Asociado señor Estrella Martínez disiente y emite la siguiente expresión a la que se une la Jueza Presidenta Oronoz Rodríguez:

> Respetuosamente discrepo del dictamen al que arriba hoy una mayoría de este Tribunal. En su lugar, hubiese confirmado a ambos foros recurridos y, en consecuencia, declarado inadmisibles como evidencia las notas con declaraciones incriminatorias que tomó el agente investigador Anthony O. Egea Guardarrama (agente investigador Egea Guardarrama) durante el interrogatorio del

señor Juan F. Torres Huertas (señor Torres Huertas).

En específico, por coincidir con el Tribunal de Primera Instancia, foro que adjudicó que el Ministerio Público, por medio del testimonio del agente Egea Guardarrama, no logró probar que la renuncia al derecho constitucional a la no autoincriminación que precedió a las declaraciones incriminatorias fuera producto de un ejercicio voluntario, consciente e inteligente. Todo ello, a pesar de haberle concedido al Ministerio Público la oportunidad de interrogar por segunda ocasión al agente investigador en la vista de admisibilidad bajo la Regla 109 (C) de Evidencia, 32 LPRA Ap. VI, a fin de que subsanara la carencia en demostrar la voluntariedad de la alegada renuncia a los derechos que le cobijan a todo sospechoso de delito. A saber, para que presentara los requisitos mínimos para la admisibilidad de una confesión reconocidos en *Pueblo v. Millán Pacheco*, 182 DPR 595 (2011). De igual forma, e indistintamente de lo anterior, opino que, al evaluar las circunstancias fácticas de este caso, las referidas notas del agente debían excluirse en virtud de los incisos (a) y (e) de la Regla 403 de Evidencia, *supra.* Me explico.

Es norma reiterada en nuestro ordenamiento penal que el derecho constitucional contra la autoincriminación es renunciable, siempre y cuando se efectúe de forma voluntaria, consciente e inteligente. *Pueblo v. Millán Pacheco*, *supra,* pág. 610. Esta renuncia debe ser producto de una elección libre y deliberada con pleno conocimiento del derecho abandonado y las consecuencias de esa decisión. *Pueblo v. Pérez Rivera*, 186 DPR 845, 872 (2012). Para salvaguardar esto, hemos reconocido que una confesión o admisión es inadmisible, por ser violatoria del derecho contra la autoincriminación, cuando se satisfacen los requisitos siguientes: (1) que, al momento de obtenerse la declaración incriminatoria, la investigación se haya centralizado sobre la persona en cuestión y esta sea considerada como sospechosa de cometer un delito; (2) que, al momento de efectuar la declaración, el sospechoso esté bajo la custodia del Estado; (3) que la declaración fue producida como resultado de un interrogatorio realizado con el objetivo de obtener manifestaciones incriminatorias; y (4) la ausencia de las advertencias en cuanto a los derechos constitucionales que nuestro

ordenamiento provee. *Pueblo v. Medina Hernández*, 158 DPR 489, 506-507 (2003).

En lo aquí pertinente, al momento de evaluar la validez de una renuncia al derecho contra la autoincriminación, los tribunales debemos considerar la totalidad de las circunstancias. *Pueblo v. Pérez Rivera, supra,* pág. 872. Entre estas se encuentran: las circunstancias personales y particulares del sospechoso, el periodo de tiempo que estuvo bajo custodia policial antes de prestar la confesión, la conducta policíaca mientras estuvo bajo custodia, si efectivamente al confesar estuvo o no asistido por un abogado, entre otros. *Pueblo v. Marrero*, 213 DPR 404, 434 (2023) (Op. disidente del Juez Asociado señor Estrella Martínez) (citando a *Pueblo v. Viruet Camacho*, 173 DPR 563, 571-573 (2008)). Véase, además, *Pueblo v. Nieves Vives*, 188 DPR 1 (2013). En otras palabras, para que un tribunal determine la validez de la renuncia a la luz de la totalidad de las circunstancias, el Ministerio Público debe presentar prueba tendente a demostrar cuáles fueron las advertencias que se realizaron y las circunstancias en las que el sospechoso hizo la confesión o la admisión. *Pueblo v. Pérez Rivera, supra*, pág. 872.

En este caso, a partir del testimonio ofrecido en la vista de admisibilidad, el foro primario cuestionó y rechazó acertadamente la verdadera intención del agente investigador Egea Guardarrama al interrogar al señor Torres Huertas. Particularmente, porque este último no era un mero sospechoso de delito u objeto de una investigación policíaca en curso, sino que se encontraba bajo la custodia del Estado en virtud del diligenciamiento de una orden de arresto en su contra. Además, el Ministerio Público contaba con dos (2) testigos que participaron en los eventos delictivos y formaron parte en la radicación de los cargos en ausencia en la vista de causa probable para arresto, conforme a la Regla 6 de Procedimiento Criminal, *infra*.

De hecho, surgió del testimonio del agente Egea Guardarrama que fue él mismo quien radicó los cargos criminales en contra del señor Torres Huertas el 20 de enero de 2021 y que, aun así, el 22 de enero de ese mismo año —cuando este fue arrestado por otros agentes del Negociado de la Policía de Puerto Rico— se le presentó como el agente que estaba investigando el doble asesinato, a pesar de que la investigación había culminado. Por tanto, pesó en la determinación de

inadmisibilidad de las notas incriminatorias el hecho de que el agente investigador realizó el interrogatorio con el fin de obtener una confesión (en su testimonio expresó en ciertas instancias: "ver qué nos podía aportar", "quería escuchar lo que él me podía brindar") y conocer su versión de los hechos cuando ya la investigación policíaca estaba terminada y se señalaba al señor Torres Huertas como partícipe. Tal como recogió el foro primario:

> Ya la investigación estaba terminada el 20 de enero de 2021, y señalaban al arrestado como partícipe de los eventos. No cabe la menor duda de que el agente conocía su participación y lo importante que era su renuncia al derecho constitucional de autoincriminación. Era su deber establecer que su declaración era una libre, voluntaria e inteligente desde el comienzo, sin intimidación o coacción por parte del funcionario del orden público y especialmente que esa renuncia era consciente entendiendo las repercusiones penales en el caso ya radicado. El propósito de su entrevista no era otra que recopilar evidencia contra el mismo arrestado, pues el crimen ya estaba esclarecido. *Resolución del Tribunal de Primera Instancia*, pág. 8.

Se consideró, además, para excluir las notas como evidencia, que el testimonio del agente investigador no pudo explicar las circunstancias que precedieron el arresto, pues no participó en el diligenciamiento de la orden ni las auscultó con el señor Torres Huertas al iniciar su interrogatorio o durante el transcurso de este. Tampoco pudo el testigo precisar el motivo por el cual el señor Torres Huertas no fue llevado sin demora innecesaria ante el magistrado luego del arresto y de completarse los trámites administrativos incidentales al arresto (fichaje). Véase, Regla 22 (a) de Procedimiento Criminal, 32 LPRA Ap. II. Adviértase que el señor Torres Huertas fue arrestado en horas de la mañana, el primer interrogatorio con el agente Egea Guardarrama inició a las 12:50 p.m. y todavía a las 6:00 p.m. continuaba en la División de Homicidios de Caguas, en espera del segundo interrogatorio con la fiscal a cargo.

Similarmente, la adjudicadora de hechos en el foro primario le restó credibilidad al testimonio del agente investigador, ya que este se contradijo en algunas instancias. En el primer día de la vista de admisibilidad, declaró que él recapituló en sus notas lo que el señor Torres Huertas le narraba. Sin embargo, al día siguiente testificó que escribió lo que este dijo tal como lo dijo (utilizó el término "transcribir"). Además, hubo discrepancias en ambos días respecto a si el señor Torres Huertas había leído y revisado el documento que contenía las notas del agente previo a colocar su firma en el mismo. Por otro lado, hubo cuestionamientos sobre quién realizó las marcas en los renglones del documento de las *Advertencias Miranda para persona sospechosa en custodia* porque el propio agente investigador declaró que fue él quien completó varios de los renglones del documento ya que el señor Torres Huertas estaba incómodo para llenarlo por sí mismo por motivo de estar esposado.

Así las cosas, un análisis de la totalidad de las circunstancias que rodearon la toma de la confesión aquí en controversia, unido a la deferencia que le brindo a la adjudicadora de hechos que observó y escuchó el testimonio del agente investigador, me lleva a concluir que el Estado no demostró que la mencionada confesión fue precedida por una renuncia consciente e inteligente por parte del señor Torres Huertas a su derecho constitucional contra la autoincriminación.

Contrario al dictamen mayoritario, desde mi punto de vista, la descripción ofrecida por el agente Egea Guardarrama a los fines de que observó al señor Torres Huertas "tranquilo", "sereno", "relajado" y "cooperador", así como que este ingirió alimentos o utilizó los servicios sanitarios luego del interrogatorio, solo describe a grandes rasgos el posible estado anímico del señor Torres Huertas. Todavía más, lo anterior no logra superar la protección constitucional contra la autoincriminación ni probar el entendimiento del derecho abandonado. Las circunstancias que rodearon la toma de esta confesión no demuestran que la renuncia fuese voluntaria, consciente e inteligente ni que se obtuviera sin que mediaran acciones coercitivas por parte de los agentes del orden público, ya fuera previo al inicio del interrogatorio o como resultado de presiones u ofertas posteriores.

Por otra parte, surge de la propia *Petición de certiorari* del Procurador General que en este caso existe una declaración jurada con la alegada confesión del señor Torres Huertas. En específico, se indica que la referida declaración la tomó la fiscal Mojica Franceschi quien recogió "nuevamente" lo que el señor Torres Huertas le había verbalizado al agente investigador Egea Guardarrama durante el interrogatorio. ("[C]abe destacar que, al señor Torres Huertas se le proveyeron las advertencias de ley en una segunda ocasión. Esto fue, cuando la fiscal llegó a la comandancia para tomarle la declaración jurada de su confesión". *Petición de certiorari*, pág. 49.) Al respecto, del testimonio del agente investigador en la vista de admisibilidad se desprende que el señor Torres Huertas "narró lo mismo en las dos ocasiones", pues surgió de su testimonio que estuvo presente en ambos interrogatorios. *Íd.*, pág. 11.

Ante estas circunstancias, admitida la declaración jurada incriminatoria del señor Torres Huertas, soy del criterio de que la referida declaración constituye la mejor evidencia del Procurador General en cuanto a la presunta confesión. Por tanto, contrario a la determinación mayoritaria, también sostengo que las notas del agente investigador aquí en controversia constituyen prueba innecesaria y acumulativa que debía ser excluida como evidencia en aras de la economía procesal. Véase, Regla 403 (e) de Evidencia de Puerto Rico, *supra*. En otras palabras, las notas del agente no constituyen evidencia fundamental para que el Estado logre probar los cargos que pesan en contra del señor Torres Huertas.

De manera similar y aún más importante, la admisión de las notas del agente investigador conlleva el riesgo de causar perjuicio al señor Torres Huertas, toda vez que resulta evidente que el Estado tiene disponible otra evidencia de igual e incluso mayor valor probatorio sin el riesgo de causarle un perjuicio indebido frente al jurado. Véase, Regla 403 (a) de Evidencia de Puerto Rico, *supra*. Véase, además, E. Chiesa Aponte, *Reglas de Evidencia comentadas*, Ediciones Situm, 2016, pág. 78, citando a *Old Chief v. United States*, 519 US 172 (1997). Precisamente, esa otra evidencia es la declaración jurada del señor Torres Huertas, la cual fue admitida por el Tribunal de Primera Instancia. Esta realidad fáctica era motivo suficiente para que este Tribunal denegara la solicitud de auxilio de jurisdicción que presentó

el Ministerio Público y que tuvo, desafortunadamente, el efecto de paralizar, un día antes la continuación del juicio por jurado.

Por otro lado, es importante tener presente que el único alcance de la determinación del Tribunal de Primera Instancia fue excluir como evidencia documental las notas del agente Egea Guardarrama. Contrario a la pretensión del Ministerio Público, la mejor evidencia para "conectar al señor Torres Huertas con la comisión de los delitos" en calidad de autor lo constituye la referida declaración jurada con su confesión, la cual no se impugnó en este procedimiento. *Petición de certiorari*, pág. 54 (cita depurada). De hecho, surge expresamente de la *Resolución* del Tribunal de Primera Instancia que tanto el documento de las advertencias que realizó la fiscal, como la declaración jurada rendida ante ella serán admisibles para ser presentadas ante al jurado. *Resolución del Tribunal de Primera Instancia*, pág. 16. Del mismo modo, el Ministerio Público continúa teniendo a su disposición el testimonio del agente investigador, pues el foro primario permitió que sea escuchado por el jurado.

Por todo ello, a mi juicio, las referidas notas son inadmisibles como evidencia y el curso correcto era su supresión, tal como determinaron ambos tribunales recurridos. El dictamen de este caso, de manera similar a lo que expresé en mi disenso en *Pueblo v. Marrero, supra*, pág. 431, instituye un precedente preocupante para las garantías constitucionales de las personas que son objeto de una pesquisa policíaca. En particular, las garantías de aquellas personas que se encuentran bajo custodia del Estado mediante una orden de arresto y en la espera de ser llevadas sin demora innecesaria ante el juez o la jueza más cercanos. Este dictamen viabiliza que los agentes del orden público utilicen -bajo el pretexto de fichaje e investigación- un esquema mecánico, preconcebido e intencional, con el único fin de obtener una declaración incriminatoria de una persona contra la cual ya existe un procedimiento judicial en curso con todas las garantías constitucionales que ello implica, como lo es el derecho a estar asistido por representación legal. Véase, Art. II, Sec. 11, Const. PR, LPRA Tomo 1 y la Emda. VI, Const. EE.UU., LPRA, Tomo 1. Al mismo tiempo se valida un análisis, desde mi punto de vista, muy laxo respecto a la consideración de las circunstancias que rodearon la confesión como guía para determinar su inadmisibilidad. Me rehúso a

consentir tal proceder y, por ello, **respetuosamente disiento.**

El Juez Asociado señor Colón Pérez disiente y hace constar las siguientes expresiones a las que se une la Jueza Presidenta Oronoz Rodríguez:

En esta ocasión, estábamos llamados y llamadas a determinar si, en cierto procedimiento criminal que se celebra ante jurado, las notas tomadas por un agente investigador durante determinado interrogatorio realizado al acusado de delito debían ser admitidas en evidencia, aun cuando el Tribunal de Primera Instancia ya había admitido una declaración jurada incriminatoria prestada por este último y cuyo contenido es en extremo similar al que se deriva de las notas en cuestión. A nuestro juicio, y contrario a lo que erróneamente decide una mayoría de mis compañeros y compañeras de estrado en la causa de epígrafe, dicha interrogante debió contestarse en la negativa, tal como correctamente lo hicieron el foro primario y el apelativo intermedio.

**Y es que, en este caso, habiendo sido admitida en evidencia la declaración jurada incriminatoria del Sr. Juan F. Torres Huertas (en adelante, "señor Torres Huertas") prestada ante la Fiscal Auxiliar Lcda. Maribel Mojica Franceschi (en adelante, "fiscal auxiliar Mojica Franceschi"), las notas objeto de la controversia ante nos, -- a saber, aquellas tomadas por el agente investigador Anthony O. Egea Guardarrama (en adelante, "agente Egea Guardarrama") durante un interrogatorio llevado a cabo luego del arresto del señor Torres Huertas --, no tienen otra finalidad que no sea la de constituir innecesaria prueba redundante y acumulativa, cuya admisibilidad pudiera causar un perjuicio indebido al acusado frente al Jurado.**

Para arribar a la anterior conclusión, basta con señalar que la Regla 403 de las de Evidencia, 32 LPRA Ap. VI, provee para que, aun cuando determinada prueba sea pertinente y no exista una regla de exclusión que impida admitirla, ésta pueda ser excluida a discreción del tribunal. Lo anterior, y en lo que aquí nos concierne, cuando el valor probatorio de dicha evidencia quede sustancialmente superado por el riesgo de causar perjuicio indebido y/o la innecesaria presentación de prueba acumulativa. *Íd.*

Sobre esto último, nos hacemos eco de lo expresado por el prestigioso tratadista de derecho penal sustantivo y de derecho procesal penal, el

Prof. Ernesto L. Chiesa Aponte (en adelante, "profesor Chiesa Aponte"), cuando, al estudiar el contenido de la Regla 403 de las de Evidencia, *supra*, y citando lo resuelto por el Tribunal Supremo de los Estados Unidos en *Old Chief v. United States*, 519 U.S. 172 (1997), sostiene que "**constituye un abuso de discreción no excluir evidencia bajo la Regla 403, cuando la evidencia ofrecida tiene claro riesgo de causar perjuicio indebido a la otra parte, si hay disponible otra evidencia de igual valor probatorio que no tiene tal riesgo de causar perjuicio indebido**". (Énfasis suplido). E. Chiesa Aponte, *Reglas de Evidencia comentadas*, Ediciones Situm, 2016, pág. 78.

Precisamente, y en lo que respecta al presente caso, esa "**otra evidencia de igual valor probatorio**" a la que hace referencia el profesor Chiesa Aponte en su análisis, es la declaración jurada ya aludida, tomada por la fiscal auxiliar Mojica Franceschi, siguiendo todas las garantías del debido proceso de ley, y a solo pocas horas de que el agente Egea Guardarrama realizara su interrogatorio. El que la referida declaración jurada haya sido admitida en evidencia, convierte las notas objeto del presente litigio, -- las cuales en su contenido no varían en nada lo expresado por el acusado de delito en la declaración jurada que le tomó la fiscal auxiliar Mojica Franceschi --, en prueba totalmente acumulativa y, por tanto, en prueba innecesaria.

Siendo ello así, no albergamos duda alguna de que en el presente caso no se cometieron los errores señalados. Por ello, respetuosamente disentimos del curso de acción seguido por una mayoría de este Tribunal en la causa de epígrafe.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Pueblo de Puerto Rico<br>Peticionario<br><br>v.<br><br>Juan F. Torres Huertas<br>Recurrido | | CC-2024-0571 |

**Opinión de Conformidad emitida por el Juez Asociado señor Candelario López.**

En San Juan, Puerto Rico, a 6 de agosto de 2025.

Estoy conforme con la *Opinión* del Tribunal en este caso. En esta ocasión, este Tribunal tuvo la oportunidad de determinar si el foro primario erró al declarar inadmisibles en evidencia las notas del agente bajo el entendido de que el Estado no demostró la validez de la renuncia del acusado a su derecho contra la autoincriminación. Considero necesario emitir la presente *Opinión de conformidad* para recalcar un aspecto doctrinal específico, a saber, el estándar probatorio aplicable a la validez de una renuncia al derecho contra la autoincriminación que le asiste constitucionalmente a cualquier persona. Veamos los hechos aplicables al caso de autos.

El 4 de diciembre de 2020, el Ministerio Público presentó cargos criminales contra el señor Juan Francisco Torres Huertas (señor Torres Huertas). Se le imputó la comisión de dos asesinatos en primer grado, tentativa de asesinato, conspiración y múltiples violaciones a la Ley de Armas. Se alegó que el señor Torres Huertas asesinó a Alex E. Díaz y Jesús A. Elías Crespo, e intentó asesinar a Francisco J. La Santa Lozada. El 20 de enero de 2021, se determinó causa probable para arresto en ausencia, y dos días después, agentes de la Policía arrestaron al señor Torres Huertas y lo llevaron a la División de Homicidios, donde el agente investigador Anthony Egea Guardarrama (agente Egea Guardarrama) le tomó una confesión.

Durante el proceso de juicio, el Ministerio Público solicitó la admisión en evidencia de las notas que contenían las declaraciones incriminatorias hechas por el señor Torres Huertas durante el interrogatorio. No obstante, el Tribunal de Primera Instancia excluyó dichas notas, al concluir que el Estado no demostró que el señor Torres Huertas renunció de forma voluntaria e inteligente a su derecho contra la autoincriminación. Según explicó, en ningún momento se presentaron las condiciones de salud del señor Torres Huertas después de su arresto, durante su conversación con el agente Egea Guardarrama y mientras permaneció bajo la custodia de la Policía de Puerto Rico.

Ciertamente, coincidimos con la Opinión mayoritaria en que se deben admitir en evidencia las declaraciones incriminatorias contenidas en las notas del agente Egea Guardarrama. Sin duda, al señor Torres Huertas se le informó de manera clara y efectiva sobre su derecho a no autoincriminarse, así como de las consecuencias de renunciar a ese derecho. Por consiguiente, es necesario concluir que el Estado logró demostrar que el señor Torres Huertas comprendió los derechos que le asisten bajo la cláusula de protección contra la autoincriminación.

Ahora bien, corresponde destacar que las Reglas 95, 95A y 95B de Procedimiento Criminal regulan el descubrimiento de prueba en los procesos criminales. Véase 34 LPRA Ap. II, R. 95, 95A y 95B. Al amparo de estas reglas, las notas del agente Egea Guardarrama constituyen material sujeto a ser descubierto. Véase *Pueblo v. Pillot Rentas,* 169 DPR 746, 760 (2006). Asimismo, a tenor con el debido proceso de ley, el Ministerio Público tiene el deber de revelar a la defensa la evidencia exculpatoria. 34 LPRA Ap. II, R. 95. En esta línea, resultaría en extremo ingenuo pensar que, si las notas del agente hubiesen contenido elementos exculpatorios, el señor Torres Huertas no hubiese reclamado su admisión en evidencia. A fin de cuentas, los jueces no debemos ser tan inocentes como para creer lo que nadie más creería. *Pueblo v. Luciano Arroyo,* 83 DPR

573, 582 (1961). Después de todo, corresponderá al juzgador de los hechos aquilatar el valor probatorio de las notas del agente Egea Guardarrama. *Pueblo v. Pagán Díaz,* 111 DPR 608, 621 (1981).

Por otra parte, como indicáramos previamente, estimamos pertinente recalcar el aspecto doctrinal sobre el estándar probatorio aplicable a la validez de una renuncia al derecho contra la autoincriminación que le asiste constitucionalmente a cualquier persona.

Recientemente, hicimos una exposición enmarcada en que el derecho contra la autoincriminación es una de las garantías más trascendentales y fundamentales del derecho penal y del procedimiento criminal en Puerto Rico. *Pueblo v. Marrero*, 213 DPR 404, 411 (2023). Sin embargo, hemos destacado que este derecho no es absoluto y se puede renunciar válidamente, siempre y cuando esta renuncia sea voluntaria, consciente e inteligente. Íd., pág. 412. Véase también *Pueblo v. Millán Pacheco,* 182 DPR 595, 610 (2011); *Pueblo v. Viruet Camacho,* 173 DPR 563, 573 (2008).

De este modo, en *Pueblo v. Millán Pacheco, supra,* pág. 612, establecimos expresamente que cuando se cuestiona que una declaración fue obtenida en violación de las advertencias de Miranda (*Miranda warnings*), el Ministerio Público debe probar, mediante el **estándar de preponderancia de la prueba**, que hubo una renuncia válida a su derecho contra la autoincriminación. Este estándar

fue el mismo expuesto por la Corte Suprema de Estados Unidos en *Lego v. Twomey*, 404 US 477, 489 (1972) y posteriormente reiterado en *Colorado v. Connelly,* 479 US 157, 169 (1986).[1] En consecuencia, el *quantum* de prueba requerido es uno menos estricto al de probar un hecho más allá de duda razonable, entiéndase, el de prueba preponderante a favor de que la declaración fue obtenida de forma voluntaria, consciente e inteligente.

Cabe destacar que el concepto de la preponderancia de la prueba, el cual rige en casos civiles,[2] consiste en establecer como hechos probados aquellos que con mayores probabilidades ocurrieron, sin que sea necesario probar un hecho con exactitud matemática. Véase *Zambrana v. Hospital Santo Asilo de Damas,* 109 DPR 517, 521 (1980). Así las cosas, sin apartarme de la Opinión del Tribunal, con la cual concuerdo plenamente en cuanto al resultado y al análisis general, reitero la importancia del estándar de preponderancia de la prueba como el marco analítico correcto al evaluar la validez de una renuncia al derecho constitucional contra la autoincriminación.

Dicho estándar reconoce que la legitimidad de una renuncia no requiere certeza absoluta, sino una convicción razonable, fundada en la mayor probabilidad,

---

[1] "*Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our Miranda doctrine, the State need prove waiver only by a preponderance of the evidence.*" *Colorado v. Connelly, supra,* pág. 168, citando a *Lego v. Twomey, supra,* pág. 489.

[2] Véase la Regla 110(F) de las Reglas de Evidencia de Puerto Rico, de Evidencia, 32 LPRA Ap. VI, R. 110(F).

de que esta fue realizada de manera voluntaria, consciente e inteligente.


                              Raúl A. Candelario López
                                   Juez Asociado